COMMONWEALTH *vs.* MIGUEL A. MARRERO
(and seven companion cases[1]).

Plymouth. February 7, 2002. - April 9, 2002.

Present: MARSHALL, C.J., GREANEY, COWIN, SOSMAN, & CORDY, JJ.

*Constitutional Law,* Confrontation of witnesses, Admissions and confessions.
*Evidence,* Joint enterprise, Photograph, Identification, Privileged com-
munication, Admissions and confessions. *Identification. Privileged
Communication. Practice, Criminal,* Continuance, Agreement between
prosecutor and witness, Argument by prosecutor, Capital case, Duplicative
convictions. *Felony-Murder Rule. Homicide. Armed Home Invasion.
Robbery.*

Certain out-of-court statements by a joint criminal venturer were admissible at
a murder trial as statements made in furtherance of a joint venture, and the
judge's thorough instructions to the jury included a proper instruction on
the joint venture exception to the hearsay rule. [492-494]
A witness's identification of the defendant as the unmasked intruder involved
in a home invasion and killing was properly admissible in evidence where,
although the witness had earlier misidentified a photograph of the
defendant, the jury was placed in a position to assess whether the
circumstances surrounding the identification detracted from its credibility
by the evidence they heard and the extensive cross-examination of the wit-
ness, and where there was no indication on the record of suggestive tactics
on the part of the police. [494]
A criminal defendant's statement to the manager of a Christian rehabilitation
center for drug addicts that he had been present at a place where a murder
occurred could not be excluded as privileged under G. L. c. 233, § 20A,
protecting as confidential statements made to a clergyman. [495]
At a hearing on a motion to suppress statements by a criminal defendant to
the police, the judge's conclusion that the defendant voluntarily waived his
Miranda rights and made the statements was supported by evidence that
the judge found credible; further, there was nothing equivocal, evasive, or
nonresponsive on the defendant's action in nodding his head "yes" and
shaking it "no" in response to questioning. [495-496]
In a murder case in which the prosecutor disclosed for the first time, four days
before trial began, its intention to call a particular witness, the judge, in an
exercise of discretion accorded under Mass. R. Crim. P. 14 (c), adequately
handled the problem created by the prosecutor's inadvertent late disclosure
of the witness by offering to require the witness to submit to a voir dire

[1]Four against the codefendant, Joshua Cintron, and three against Miguel A.
Marrero.

hearing or to an interview by defense counsel or a defense investigator, or both. [496-497]

At a murder trial in which a prosecution witness testified pursuant to a plea and immunity agreement, there was no substantial likelihood that the jury could have understood that the prosecutor had a means of verifying the witness's testimony or that the witness's testimony should be accorded high value because of rewards promised in the agreement for "truthful" testimony, where the judge's charge to the jury was clear and forceful in dispelling any implication inherent in the agreement that the prosecutor warranted that the witness was telling the truth. [497-502]

At a murder trial, the judge did not err by not charging on felony murder in the second degree, where such instruction was not requested and, in any event, the evidence would not have supported such an instruction. [502-503]

On appeal of murder convictions in which general verdicts finding that both armed home invasion and armed robbery were prerequisite felonies for the convictions of two defendants of felony-murder in the first degree, this court concluded that only one of the two felonies was duplicative and that, because the Commonwealth was entitled to verdicts on the highest crimes charged, the armed robbery convictions were to be vacated. [503]

INDICTMENTS found and returned in the Superior Court Department on March 25, April 3, and June 16, 1997, respectively.

Pretrial motions in limine and to suppress evidence were heard by *Charles J. Hely*, J., and the cases were tried before him.

*Daniel J. Johnedis* for Miguel A. Marrero.

*Jeffrey L. Baler* for Joshua Cintron.

*Gail M. McKenna*, Assistant District Attorney, for the Commonwealth.

GREANEY, J. A jury convicted the defendants, Miguel A. Marrero and Joshua Cintron, of felony-murder in the first degree (finding both armed robbery and armed home invasion as predicate felonies). The defendants were also convicted of armed robbery, armed home invasion, and unlawful possession of a firearm. Represented by new counsel on appeal, each defendant asserts claims of error pertinent to himself, and both defendants make certain common claims of error. We discern no error and no basis on which to exercise our authority under G. L. c. 278, § 33E, to reduce the murder convictions to a lesser degree of guilt or to order a new trial. We shall first set forth a brief summary of the facts that could have been found

by the jury based on the Commonwealth's evidence. We shall next proceed to decide Marrero's separate claims of error, then Cintron's, and we shall conclude by deciding the claims of error asserted by both defendants.

Santiago Mena was shot and killed in his Brockton apartment in the early morning hours of January 20, 1997. Several weeks prior to his murder, Mena and several others had begun selling drugs out of a second-floor apartment at 134 Green Street in Brockton. Their drug sales cut into the drug business of the defendants, who at that time were selling drugs out of a third-floor apartment at 234 Green Street. Cintron, according to trial testimony, believed that Mena was selling "better dope" than the defendants. Cintron was upset as well because he believed that Mena had stolen $500 from a friend and because Mena had refused to post bail for Cintron's cousin, Henry Nunez, who worked for the same drug organization as Mena. The Commonwealth argued that these personal problems, along with a desire to eliminate a rival drug dealer from the area, motivated Mena's killing.

On January 19, 1997, while visiting Cintron's apartment, Mary Hoard overheard a conversation, primarily in Spanish, between Cintron and a woman she believed may have been Inga Washington. Hoard heard Cintron say "they were going to go down the street and take care of the problem that had been there but they had to wait till after dark to do it." Hoard also heard Cintron say: "It would be easy. They had to wait till later, go at night when it was dark. It would be easy . . . ." The woman then warned Cintron to be quiet because Hoard might understand them.

At about 7 P.M. that evening, Inga Washington visited her boy friend, Alex Pagan, at 234 Green Street. Also present in the apartment at that time were the defendants Cintron and Marrero, and Hector Maldonado ("Nunie"). Washington observed Cintron and Marrero handling a black nine millimeter pistol and overheard a conversation about Mena's undercutting their drug sales. She also heard both defendants say that they were "going to take care of this and do what [they had] to do" and "they were just going to get their money from the guy down the street." Cintron said that he and Marrero would kick in the back

door and let Washington in the front door. All four (Cintron, Marrero, Washington, and Nunie) then left the apartment. They were dressed in black and wearing black hats or "hoodies."

Marrero drove the group down the street in his automobile and parked a few blocks from 134 Green Street. A few minutes before 2:30 A.M., on January 20, 1997, Marrero and Cintron went to the rear entrance of Mena's apartment, which was locked and barricaded with a refrigerator. Cintron wore a mask and carried a gun while Marrero was unmasked and wielded a knife. The defendants forced down the door. When Mena came to the door to see what was happening, Cintron shot him at close range in the chest.

Kristyn Genereux, who also lived at 134 Green Street, heard a crash and ran to the kitchen. On seeing the masked intruders with guns[2] and a knife, she retreated to the bedroom. Two of the men followed her and, as a masked man held a gun to her head, demanded money and drugs. Genereux gave them $150 from her pants pocket and packets of heroin and cocaine that were in the bedroom closet. She then heard someone yell, "Let's get out of here. Let's go."

Meanwhile, Washington and Nunie waited outside the front door of the apartment building. After about three minutes, they heard a gun shot and a woman, presumably Genereux, scream, "He's got a gun, he's got a gun." Washington and Nunie decided to enter the building. On their way inside, they were passed by a person known as "Tommy" (or "Chabey"), who also resided at 134 Green Street, fleeing the scene barefoot and without a coat. Cintron and Marrero then ran from the front door of Mena's apartment and told Washington and Nunie to "go, go, go."[3] Cintron was behind Marrero and was holding a gun. The three men got into Marrero's automobile and left the scene, while Washington walked back to 234 Green Street. When the police arrived at 134 Green Street, they found Mena

---

[2]Genereux testified that another intruder entered the apartment through the front door wearing a white ski mask and holding a silver gun. She also testified that she saw three men in the kitchen, two whose faces were completely covered by black masks.

[3]Genereux testified that four individuals had been in the apartment at the time of the shooting.

lying unconscious on the floor in a pool of blood, next to an overturned refrigerator. Mena was taken to a hospital and pronounced dead a short time later.

It was approximately 3:30 A.M. when Cintron, Marrero, and Nunie returned to 234 Green Street. Marrero said that he had gotten some money from Mena's apartment, and asked Cintron, "Why did you have to shoot him?" To that, Cintron replied, "Fuck him." Cintron acknowledged that he had shot Mena in the chest, and added, "I hope the guy's not dead." He also said that he had to "get out of here."

1. *Issues Raised by Marrero.*

(a) Within twelve hours of the shooting, police arrived at the apartment of Cintron's sister, Marlis Cintron, where they found both defendants. The defendants agreed to accompany the officers to the police station, where they were questioned separately and allowed to leave. During his questioning, Cintron told the police that he had been with Marrero and Nunie at 234 Green Street on the previous day, leaving to play pool around 10 P.M., and returning one hour later. During the same interview, Cintron stated that he knew Mena and had, a few days earlier, confronted him about obtaining bail money for his cousin, Henry Nunez, but Mena refused to help. He also said that a friend of his believed Mena had recently stolen money from her. He told the police that he knew about the murder because he had received a telephone call that day from a drug dealer who worked with Mena who said, "We know you killed [Mena]. You better watch out."

The above statements were introduced in evidence through the testimony of the State trooper who spoke with Cintron on January 20, and repeated, in substantially the same language, during testimony of another State trooper who had spoken with Cintron in early February. Prior to the first trooper's testimony, Marrero's trial counsel requested that the judge instruct the jury that any statement of Cintron could not be used as evidence against Marrero. The judge indicated that he would defer his decision on the request until hearing the rest of the evidence.[4]

Marrero contends that the admission of Cintron's statements

---

[4]He gave a limiting instruction, however, regarding statements made by Cintron on his arrest in Springfield on May 10, 1997, both after the direct

violated his constitutional right to confrontation as set forth by the United States Supreme Court in *Bruton* v. *United States*, 391 U.S. 123, 126 (1968). In support of this contention, Marrero asserts that, while the statements standing alone may not implicate him, they are inculpatory when considered with other evidence because they place him with Cintron at the time the crimes were committed. The likely effect of the statements on the jury, contends Marrero, was to associate him with Cintron's statements of motive (his anger at Mena's refusal to help furnish bail for Nunez and Mena's suspected theft of the money), and with certain highly inculpatory statements that Cintron made to police when he was arrested in Springfield (which the jury were instructed could not be used against Marrera, see note 4, *supra*). Because Cintron did not testify at trial, Marrero argues, his constitutional right to cross-examine the witnesses against him was denied. See *id.* at 126.

The statements were admissible as statements made in furtherance of a joint venture. The *Bruton* decision, therefore, does not apply.[5] See *Commonwealth* v. *Bongarzone*, 390 Mass. 326, 339-340 (1983). "Under the joint venture exception to the hearsay rule, '[o]ut-of-court statements by joint criminal venturers are admissible against the others if the statements are made during the pendency of the criminal enterprise and in furtherance of it.' " *Commonwealth* v. *Hardy*, 431 Mass. 387, 393 (2000), quoting *Commonwealth* v. *Clarke*, 418 Mass. 207, 218 (1994). The judge's thorough instructions to the jury included a proper instruction on the joint venture exception to the hearsay rule. Marrero's claim that any joint venture between himself and

---

examination of the State trooper who testified regarding the Springfield statements and in his final charge.

[5]Even if there were a *Bruton* problem in this case, we discern no possible prejudice to Marrero from the jury's consideration of Cintron's statements. *Bruton* v. *United States*, 391 U.S. 123, 126 (1968). There was testimony that Marrero himself told the police, on January 20, that he and Cintron had spent the previous evening together. Moreover, the jury heard evidence that Marrero had told the manager of a drug and alcohol rehabilitation center that he had been present where a murder took place. See *Commonwealth* v. *Adams*, 416 Mass. 55, 58 (1993), quoting *Commonwealth* v. *Sinnott*, 399 Mass. 863, 872 (1987) (test whether *Bruton* error is harmless is whether any " 'spillover' resulting from imperfect interlock [of the statements] was without effect on the jury and did not contribute to the verdict").

Cintron had ended at the time the statements were made, see *Commonwealth* v. *Colon-Cruz,* 408 Mass. 533, 543 (1990), has no merit in light of undisputed evidence that the challenged statements were made only a few hours after the crimes, and police had found both defendants together in the apartment of Cintron's sister.

(b) On the day of the murder, at the police station, Genereux was shown a series of photographic arrays. She first selected a photograph of Marrero (in which Marrero had a moustache and beard), but stated she believed the photograph was of a cousin or relative of the unmasked intruder. Later that day, Genereux spoke to "Tommy" on the telephone. She told him that she had recognized the unmasked intruder, the one with the knife, as someone who had been at the 134 Green Street apartment on the previous Friday, picking up a cable box. Tommy told Genereux that the name of the person who had picked up the cable box was "Miguel" (the defendant Marrero). After that conversation, Genereux returned to the police station at her own request and was shown another photographic array. This time, she was able to identify Marrero as the unmasked intruder from a photograph of Marrero taken that day. She explained to the police that facial hair in the first photograph had confused her, as the unmasked intruder had been clean shaven during the attack.

The judge properly admitted the evidence of Genereux's identification of Marrero's photograph. Contrary to Marrero's assertions, the identification was not based on what "Tommy" (who was a missing witness at trial) told Genereux, but on Genereux's recollection that she had seen the same person at the apartment a few days earlier. Tommy supplied a name to Genereux, but it was Genereux who, on her return to the police station, selected the photograph of Marrero from the array. The jury heard evidence of Genereux's telephone call to Tommy and subsequent identification of Marrero's photograph and she was subject to extensive cross-examination at trial. The jury thus were in a position to assess whether the circumstances surrounding the identification detracted from its credibility. There is no hint in the record of suggestive tactics on the part of the police that would implicate Marrero's due process rights. See *Commonwealth* v. *Odware,* 429 Mass. 231, 235-236 (1999).

(c) On the night of January 21, 1997, Marrero checked himself into a Christian rehabilitation center for drug addicts and alcoholics. The next day he told the manager of the facility, Wilfredo Montanez, that he had been present at a place where a murder occurred. The judge, after a voir dire, rejected Marrero's claim that his statement to Montanez should have been excluded because it was privileged under G. L. c. 233, § 20A, the statute which protects, as confidential, statements made to a clergyman. The statute encompasses "[a] priest, rabbi or ordained or licensed minister of any church or an accredited Christian Science practitioner . . . ."

The judge ruled correctly. Montanez's testimony at the voir dire made it clear that he was not ordained or licensed as any form of clergyman, and therefore not a clergyman as defined in the statute. We decline to expand the statute to include Montanez. Marrero's contention that the facility was operated by an ordained minister and Marrero was seeking "religious or spiritual advice or comfort" does not suffice to make his conversation with Montanez privileged. This is not an appropriate case to consider the possible adoption of Proposed Mass. R. Evid. 505, which expands the definition of a clergyman beyond the definition contained in the statute.

2. *Issues Raised by Cintron.*

(a) Cintron filed a pretrial motion to suppress statements he made to the police. The judge conducted an evidentiary hearing on the motion and denied it in a written memorandum of decision. Cintron now argues that the judge erred in concluding that Cintron voluntarily waived his Miranda rights and voluntarily made statements. He also contends that his response to two questions asked by State Trooper James White were involuntarily made and were ambiguous. The testimony in question was given by State Trooper Paul L'Italien at the motion hearing in the following manner:

THE WITNESS: "[Cintron] stated that he didn't do it, and Trooper White asked him, 'If you didn't do it, who did it?'"

THE PROSECUTOR: "How did the defendant respond to that?"

THE WITNESS: "He gave no reply at all. Trooper White then stated to [Cintron], 'You didn't mean to kill him, did you?' At that point [Cintron] shook his head back and forth in a negative manner. Trooper White then asked, '[Cintron], you wish you could have that night back, don't you?' In response to this question, [Cintron] shook his head up and down in an affirmative manner."

The judge's conclusions that Cintron's statements to the police were made after he had received, understood, and waived his Miranda rights, and were voluntary in all respects, were supported by the evidence that the judge found credible. There is no basis in the evidence or in the judge's decision to support Cintron's present argument that his responses were involuntary.

We reject as well Cintron's arguments that the responses set forth above should have been suppressed because they were tantamount to silence and ambiguous. The judge properly found that Cintron's actions constituted "generally recognized negative and affirmative gestures that came in direct response to [Trooper White's] questions." There was nothing equivocal, evasive, or nonresponsive in Cintron's action. His conduct — nodding his head "yes" and shaking it "no" in response to questioning — was communicative in nature and constituted admissions by deliberate nonverbal expression.

(b) On Friday, January 15, 1999, four days before the trial began, the Commonwealth disclosed for the first time its intention to call Mary Hoard as a witness. Cintron thereafter filed a motion seeking either a sixty-day continuance or the exclusion of Hoard's testimony, pursuant to Mass. R. Crim. P. 14 (c), 378 Mass. 874 (1979). The judge denied the requested relief at that time, based on his finding that the late disclosure was due to a good faith mistake (a fact that Cintron's trial counsel did not contest). The judge offered, however, to require Hoard to submit to a voir dire hearing or to an interview by Cintron's trial counsel or investigator, or both, as a remedy for the delayed disclosure. Cintron's trial counsel agreed to a voir dire hearing and requested a court interpreter to interview Hoard regarding her ability to speak Spanish.

At the voir dire hearing, Cintron's trial attorney questioned Hoard extensively regarding her limited ability to understand

and speak Spanish. Hoard's testimony indicated that, although she never formally learned Spanish and presently understood virtually no Spanish at all, she had been able to understand (but not speak) Spanish two years earlier, on January 19, 1997, when she overheard Cintron discussing plans to "take care of it," because at that time she had lived around Spanish-speaking people. At the hearing's conclusion, Cintron moved to exclude Hoard's testimony as being unreliable. The judge denied the motion.

Cintron now claims that the judge abused his discretion in failing to exclude Hoard's testimony or to allow a sixty-day continuance. Although the late disclosure forever denied him the opportunity to test, on a firsthand basis, Hoard's ability to understand his words, Cintron contends that a continuance would, at least, have provided time to locate witnesses with knowledge of Hoard's ability to speak or understand Spanish in 1997. According to Cintron, the voir dire hearing failed to remedy the prejudice that resulted from his inability to investigate and, thus, to challenge effectively the extent of Hoard's familiarity with Spanish in 1997. His claim of prejudice is undercut, however, by his failure, after the voir dire hearing, to renew his motion for a continuance. See *Commonwealth* v. *Hamilton*, 426 Mass. 67, 71 (1997). The judge had considerable discretion under rule 14 (c), and adequately handled the problem created by the prosecution's inadvertent late disclosure of the witness. See *id.* at 70; *Commonwealth* v. *Donovan*, 395 Mass. 20, 24 (1985).

3. *Issues Raised by Both Defendants.*

(a) Inga Washington testified at trial pursuant to a written agreement that required her to provide complete, accurate, and truthful information and to give her full cooperation to the police, in return for the Commonwealth's promise to accept her pleas of guilty to drug charges pending against her and to recommend, in connection with those charges, a sentence of probation with drug counselling and abstinence from drugs. The Commonwealth also agreed not to initiate criminal proceedings against Washington based on her activities on January 20, 1997. According to the terms of the agreement, if Washington did not cooperate truthfully, she would thereafter be subject to prosecu-

tion for any criminal violation known to the Commonwealth, including perjury. Pursuant to this agreement, Washington gave extensive testimony which, if believed by the jury, squarely implicated both defendants in the murder and other crimes committed at 134 Green Street in the early morning of January 20, 1997. Her credibility was, therefore, a key issue at trial.

Evidence of the agreement was presented to the jury in the following manner. On direct examination, the prosecutor elicited that Washington was testifying pursuant to an agreement and elicited as well that her understanding of the agreement was "[t]o make sure I tell the truth."[6] Washington further testified that her understanding of her portion of the agreement was to "[s]tay out of trouble [and] tell the truth." When asked whether she understood that she could be prosecuted for perjury if she failed to testify truthfully, Washington responded, "Yes."

During cross-examination, both defendants vigorously challenged the credibility of Washington's testimony based on the agreement.[7] On redirect, the prosecutor reviewed with Washington her understanding of each of the terms of the agreement. The judge then admitted the complete agreement, which was in the form of a letter addressed to Washington's attorney, on the letterhead of the office of the district attorney, and signed by the assistant district attorney, Washington, and Washington's attorney, as an exhibit for the jury's consideration. No objection was made at trial to the prosecutor's manner of questioning on redirect or to the admission of the unredacted agreement in evidence.

During recross-examination and again during closing arguments, the defendants pursued efforts to impeach Washington's testimony.[8] The prosecutor responded during his closing argument, stating that Washington "tells the truth, at least that's as

---

[6]Marrero's trial counsel moved to strike this particular portion of Washington's testimony. The judge stated that he would take the motion under advisement, but allowed the prosecutor to continue questioning Washington on the substance of the agreement.

[7]At one point, after eliciting from Washington the extent of the promises made to her in exchange for her testimony, Marrero's trial counsel asked rhetorically, "So you got a sweetheart deal, correct?"

[8]On his recross-examination of Washington, Marrero's trial counsel elicited Washington's agreement that, in order not to lose custody of her child, she

far as I could follow it," and "I suggest to you [Washington] told the grand jury exactly what happened and she told you exactly what happened." The prosecutor then urged the jury to read the agreement for themselves: "Here it is. Black and white. Look at it. Read it. It's very clear. It's very simple. Ask yourselves what possible motivation does this deal give [her] to lie. It's very clear. It's for her truthful and complete testimony." Neither defense counsel objected to the above comments.

The defendants now contend that the prosecution's use of the agreement in connection with Washington's testimony was improper. Specifically, they claim that vouching prohibited under the guidelines set forth in *Commonwealth v. Ciampa*, 406 Mass. 257, 264-266 (1989), occurred by reason of (1) Washington's testimony elicited on direct examination regarding her understanding of her obligation under the agreement to testify truthfully; (2) Washington's repetitive testimony elicited on redirect examination regarding her contractual obligation to testify truthfully; (3) prosecutorial remarks made during closing arguments; and (4) the admission of the unredacted agreement in evidence. In making their argument, the defendants also reference other decisions of this court and the Appeals Court, concerning the proper use of plea or immunity agreements. See, e.g., *Commonwealth v. Rivera*, 430 Mass. 91, 95-99 (1999); *Commonwealth v. Meuse*, 423 Mass. 831, 832 (1996); *Commonwealth v. Sullivan*, 410 Mass. 521, 524-525 (1991); *Commonwealth v. Irving*, 51 Mass. App. Ct. 285, 294-295 (2001); *Commonwealth v. Lindsey*, 48 Mass. App. Ct. 641, 644-645

---

"told [the police] what they wanted to hear." During his closing arguments, Marrero's trial counsel forcefully argued to the jury that Washington should not be believed because she "got a deal. . . . What does she do in return for her deal? She has to come in here and testify. Well, fine. She comes in here and testifies. Don't be swayed by·this truthful business because the truth is what the police think the truth is. [Washington] has to testify a certain way or she will be, her deal on drugs will go out the window. She'll be facing close to three years and she'll be facing perjury charges."

Cintron's trial counsel, during his closing arguments, returned to the matter of the agreement: "But I'll tell you where the heart of that deal is, where the best part of that deal is for Inga Washington. It's the murder case. And when [the police] told her you could go to jail for the rest of [her] life, she knew what she had to do and she did it. She was pretty street smart. That's when she knew she was cooperating with the government fully and completely and saying what they wanted to hear."

(2000); *Commonwealth* v. *Robinson*, 48 Mass. App. Ct. 329, 338 (1999).

Testimony offered by a witness in exchange for the government's promise of a plea bargain or immunity should be treated with caution, lest the jury believe that the government has special knowledge of the veracity of the witness's testimony. See *Commonwealth* v. *Ciampa, supra* at 260-261. The danger increases when the jury are informed that the validity of the agreement depends on the truthful nature of the testimony. See *id.* at 263. If properly handled, however, such an agreement does not constitute improper prosecutorial vouching for the witness. See *id.* at 260. In the *Ciampa* decision, this court set forth guidelines to be used when a witness testifies pursuant to a plea or immunity agreement that explicitly incorporates a witness's promise to testify truthfully, to minimize the possibility that the jury will believe the witness because the Commonwealth, in effect, has guaranteed the truth of the witness's testimony. See *id.* at 264-266. These guidelines were generally followed in this case.

The prosecutor's questions on direct examination properly elicited the fact that Washington had entered into a plea and immunity agreement and that she understood her obligations under it. See *id.* at 264. Because the defendants then undertook to impeach Washington's credibility based on the agreement, the prosecutor was allowed to bolster her testimony on redirect. See *id.* With the exception of Marrero's motion to strike a portion of Washington's direct testimony, see note 7, *supra*, no objection was lodged by either defendant regarding Washington's testimony. The judge pointedly instructed the jury on the issue of testimony pursuant to a plea bargain or immunity agreement, as required by *Commonwealth* v. *Ciampa, supra* at 266, both immediately after Washington's testimony and in his final charge. The judge told the jury that "[t]he testimony of a witness under such an agreement must be considered with particular caution and care," and that the prosecutor did not have "any special knowledge of the truthfulness of her testimony." The jury's attention was clearly focused on the incentives that could have influenced Washington's testimony and they were warned that the prosecutor did not know whether Washington

was telling the truth. There was no objection to the judge's instructions. The charge was complete and comprehensive, and we set it forth (with some revisions) in the Appendix of this opinion for possible use by other judges in future cases.

We agree that the manner in which the agreement was presented to the jury was not perfect in all respects. It would have been preferable for the judge to have redacted the signatures of the assistant district attorney (who prosecuted this case) and Washington's attorney, before admitting the agreement for the jury's consideration. It is possible that the signatures could have signaled to the jury that the prosecutor and Washington's attorney were attesting to Washington's credibility. Repeated references in the agreement to Washington's obligation to tell the truth also should have been deleted. See *id.* at 262-263. In the absence of an objection, however, such redaction was not required. See *Commonwealth* v. *Sullivan, supra* at 524-525.

In addition, at least one challenged remark made by the prosecutor in his summation approached perilously close to the limits of permissible argument. Although a prosecutor is allowed to remind the jury of the government's agreement with the witness, and argue reasonable inferences from its requirement of truthful testimony, he "may not explicitly or implicitly vouch to the jury that he . . . knows that the witness's testimony is true." *Commonwealth* v. *Ciampa, supra* at 265. Thus, although the prosecutor was free to encourage the jury to read the agreement (especially in light of the defendants' closing arguments to the jury that Washington was a "pretty street smart" witness and one who "got her deal" under which she "ha[d] to testify a certain way"),[9] he should not have stated that Washington "tells the truth, at least that's as far as [he] could follow it." No objections were made, however, and the prejudicial effect of this remark was neutralized by a rhetorical question posed by the prosecutor just minutes before, "Am I standing here telling you that Inga Washington is the paramount of credibility?"

---

[9]The prosecutor was also free to point out to the jury, as he did, that the existence of the agreement gave Washington no incentive to lie. See *Commonwealth* v. *Ciampa*, 406 Mass. 257, 265 (1989).

We conclude that there is no substantial likelihood that the jury could have understood that the prosecutor had a means of verifying Washington's testimony or that Washington's testimony should be accorded high value because of rewards promised in the agreement for "truthful" testimony. As discussed above, the judge's charge was clear and forceful. The judge specifically told the jury that the "district attorney is not in a position to have any specialized knowledge or opinion about whether [Washington's] testimony is truthful or not" and that they "must disregard any implication that the government or district attorney believes or doesn't believe any part of her testimony." The effect of the charge was to dispel any implication inherent in the agreement that the prosecutor warranted that Washington was telling the truth. Cf. *Commonwealth* v. *Meuse*, *supra* at 832 (jury instructions did not neutralize improper prosecutorial vouching in absence of specific instruction that government does not know whether witness is truthful).[10]

(b) We reject the argument that the judge erred by not charging on felony murder in the second degree. No such instruction was requested, and, in any event, the evidence would not have supported such an instruction. The judge properly instructed on murder in the second degree in its usual formulation. This is all that was required. See *Commonwealth* v. *Christian*, 430 Mass.

[10]We reject Cintron's claim that his trial counsel's failure to object to Washington's testimony surrounding the agreement and the admission of the agreement in evidence constituted ineffective assistance of counsel. Because the defendant has been convicted of murder, we examine this claim to determine whether there exists a substantial likelihood of a miscarriage of justice, as required under G. L. c. 278, § 33E, which is more favorable to a defendant than is the general constitutional standard for determining ineffective assistance of counsel. See *Commonwealth* v. *Coonan*, 428 Mass. 823, 826-827 (1999).

Cintron's trial counsel cross-examined Washington extensively regarding the agreement and argued to the jury that Washington was "pretty street smart" to have made such deal. He may well have thought that evidence of the agreement would work to Cintron's advantage. In any case, in view of our determination that any imperfections in the handling of the agreement at trial could not have caused the jury to misunderstand the agreement as a guarantee of Washington's truthfulness, any failure on the part of Cintron's trial counsel to object to evidence of the agreement was not likely to have influenced the jury's conclusion. See *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992).

552, 557-559 (2000); *Commonwealth* v. *Cruz*, 430 Mass. 182, 184-185 (1999).[11]

(c) After consideration of the defendants' arguments asking that we grant relief pursuant to G. L. c. 278, § 33E, we agree with the Commonwealth that there is no basis to grant such relief.

(d) The jury returned a general verdict finding that both armed home invasion and armed robbery were predicate felonies for the convictions of felony-murder in the first degree of both defendants. The defendants are not entitled to have both the armed robbery and the armed home invasion convictions vacated on the ground that they are duplicative of the felony-murder convictions. We agree with the Commonwealth that only one of the two felonies as to each defendant is duplicative and that, because it is entitled to verdicts on the highest crimes charged, the armed robbery convictions are the convictions to be vacated. See *Commonwealth* v. *Doucette*, 430 Mass. 461, 471 (1999). See also *Commonwealth* v. *O'Brien*, 432 Mass. 578, 591 (2000). Cf. *Commonwealth* v. *Jackson*, 428 Mass. 455, 467 (1998).

4. The convictions and sentences of the defendants on the indictments charging them with armed robbery are vacated, the verdicts are set aside, and the indictments dismissed. The defendants' convictions of felony-murder in the first degree, armed home invasion, and the unlawful possession of a firearm are affirmed.

*So ordered.*

---

[11]After oral argument, Marrero's appellate counsel submitted a letter pursuant to Mass. R. A. P. 16, as amended, 428 Mass. 1603 (1999), in which he appears to assert that Marrero was denied the benefit of any instruction on murder in the second degree. He contends that the judge's instruction on second degree murder was tailored to murder in the first degree by deliberate premeditation, a theory on which Cintron alone was being tried, and so the instruction would have been perceived by the jury not to apply to Marrero. We reject this assertion. We have examined the judge's instructions and conclude that the jury were fully informed that they could find Marrero guilty of felony-murder in the first degree or murder in the second degree.

Commonwealth *v.* Marrero.

### APPENDIX.

"You have heard testimony that Inga Washington testified and had an agreement with the district attorney's office and is testifying under the terms of that agreement. One part of the agreement, as you have heard the evidence, is that she has been promised probation on a drug charge that might otherwise result in a mandatory minimum prison sentence.

"Another part of the agreement is that the district attorney's office has agreed with her, and the district attorney brought this out, there's no dispute about this. The district attorney has agreed with her not to prosecute her for any involvement or any conduct by her regarding the events of January 20, 1997, at 134 Green Street.

"So, in effect, on the basis of the district attorney's agreement, she has immunity from being prosecuted for any of those events on January 20, 1997, at Green Street.

"When a witness is testifying under an agreement with the prosecutor for immunity for certain events, the jury must consider that as a possible incentive and whether that agreement or that immunity might affect her credibility and your assessment of her credibility.

"It is a factor you should consider when, after hearing all the evidence at the trial, you will be sizing up the credibility of all the witnesses, and whether a witness has testified under a grant of immunity is a factor to be considered.

"When a witness testifies under a grant of immunity, the jury should be reminded that they must scrutinize her testimony with great care, that such a grant of immunity may influence a witness, and you can consider whether it influenced the witness and whether it affects your assessment of her truthfulness.

"Also, you have heard reference in the testimony, in the questioning by the attorneys, that she had an agreement to give truthful testimony. Whether or not her testimony is truthful will be a question solely for the jury to decide after hearing all of the evidence in the case.

"The district attorney is not in a position to have any specialized knowledge or opinion about whether her testimony is truthful or not. You may not consider anyone else's opinion, whether it's a government official or anyone else. You may not consider someone else's opinion about whether her testimony is truthful or not.

"The jury is not permitted in a criminal case to consider people's opinions about whether someone is telling the truth. You must disregard any implication that the government or district attorney believes or doesn't believe any part of her testimony.

"Whether her testimony is truthful or not, and credible, is solely for the jury to determine. You will be sizing up the credibility of all the witnesses in the case. That's my instruction on the concept of what the rules are with respect to a grant of immunity and how the jury should consider it.

"The judge's comments, now or at any time during the trial, are not any suggestion one way or the other about the credibility of any witness. Decisions about the credibility of any witnesses, this witness or any other witness, are solely for the jury to determine based on your assessment of all the evidence in the case."