## Commonwealth vs. Derrel C. Webb.

Plymouth. February 7, 2014. - April 29, 2014.

Present: Ireland, C.J., Spina, Botsford, Gants, & Lenk, JJ.

*Homicide. Firearms. Evidence,* Bias, Credibility of witness. *Witness,* Bias, Credibility, Immunity. *Practice, Criminal,* Capital case, Agreement between prosecutor and witness, Promise by prosecutor, Immunity from prosecution, Argument by prosecutor, Instructions to jury.

At a murder trial at which certain witnesses testified pursuant to grants of immunity and plea agreements, no error occurred and no substantial likelihood of a miscarriage of justice arose from the prosecutor's elicitation, on direct examination, from two witnesses of their obligation to testify truthfully, where defense counsel's remarks in his opening statement concerning the witnesses testifying pursuant to cooperation agreements or grants of immunity essentially served to challenge the witnesses' credibility. [31-34]

At a murder trial at which certain witnesses testified pursuant to grants of immunity and plea agreements, in the circumstances of the case, no substantial likelihood of a miscarriage of justice arose from the failure to redact, on plea agreements in unrelated Federal prosecutions, the signatures of the witness's attorney and the prosecutor [34]; moreover, the judge did not err in declining to tell the jury that they were not to consider the witnesses' guilty pleas to Federal charges as part of the proof against the defendant, where those witnesses were not accomplices and had pleaded guilty to entirely unrelated crimes [34-35].

At a murder trial at which certain witnesses testified pursuant to grants of immunity and plea agreements, although it would have been preferable for the judge to have instructed the jury to examine the testimony of those witnesses who testified pursuant to grants of immunity with particular care, as he did with regard to witnesses who testified pursuant to plea agreements, no error requiring reversal occurred, where, looking at the instructions in their entirety, the jury were not left with the impression that the testimony of immunized witnesses somehow should be scrutinized less closely than that of witnesses who testified pursuant to plea agreements. [35]

At a murder trial at which certain witnesses testified pursuant to grants of immunity and plea agreements, no error arose in the closing argument of the prosecutor, where she did not improperly express her personal belief in the credibility of the immunized witnesses or witnesses who testified pursuant to plea agreements, but rather argued that the motivation of the witnesses was to tell the truth. [35-36]

At a murder trial at which certain witnesses testified pursuant to grants of immunity and plea agreements, the handling of the immunized testimony and plea agreements by the judge, together with the remarks of the prosecutor in

closing argument, collectively did not create a substantial likelihood of a miscarriage of justice. [36]


INDICTMENTS found and returned in the Superior Court Department on March 12, 2010.

The cases were tried before *Richard J. Chin*, J.

*David Keighley* for the defendant.

*Audrey Anderson*, Assistant District Attorney, for the Commonwealth.

IRELAND, C.J. On May 23, 2012, a jury convicted the defendant, Derrel C. Webb, of murder in the first degree on the theories of deliberate premeditation and extreme atrocity or cruelty, and of unlawful possession of a firearm. Represented by new counsel on appeal, the defendant argues that a substantial likelihood of a miscarriage of justice arose both from the manner in which the judge admitted witness testimony given pursuant to grants of immunity and plea agreements, and from improper vouching by the prosecutor during her closing argument. We affirm the defendant's convictions and discern no basis to exercise our authority pursuant to G. L. c. 278, § 33E.

1. *Background.* Based on the Commonwealth's evidence, the jury could have found the following facts. On July 28, 2008, at approximately 11:15 P.M., the victim and his older brother, Anthony, returned home to their apartment in Brockton. The boys went upstairs to the second floor. Shortly thereafter, their mother heard some "commotion" and ran upstairs. Anthony screamed that the victim had been shot. The victim's mother found the victim lying on the floor. There was blood on the back of his head, and he was making gurgling sounds. She started cardiopulmonary resuscitation and told Anthony to telephone 911.

Emergency medical technicians (EMTs) arrived and transported the victim to a nearby hospital. From there, he was transported by flight to a hospital in Boston where soon thereafter, in the early morning of July 29, he died as a result of a gunshot wound to the head, with skull perforation and brain penetration. The victim was fifteen years of age.

Brockton police officers arrived at the victim's home before the EMTs had left with him. In the room in which the victim

lay (his bedroom), one officer observed three holes in a window. Below that window, on a walkway leading to the entrance of the victim's apartment, police recovered three .380 caliber discharged cartridge casings. Two spent projectiles were recovered inside the victim's apartment: one inside a television set in the victim's bedroom and the other embedded in a wall that was perpendicular to his bedroom. An additional spent projectile was removed from the victim's body during his autopsy and was turned over to police.

The defendant was implicated as the shooter by Tayvin Burton and Joshua Taylor, who were granted immunity for their trial testimony.[1] Taylor did not have much of a present memory at trial, but recalled that, before the shooting, he, Burton, and the defendant had been at the house of John Parks[2] on Green Street in Brockton. Taylor stated that he, the defendant, and Burton then went to the victim's house where Taylor heard three shots fired. The three fled to a friend's house, where, in the basement, Taylor observed the defendant with a gun. Taylor recounted that, a couple days later, the defendant told him that he had "fucked up." According to Taylor, the defendant also remarked, "It's one under the belt though."

Burton was able to recall further details. He knew the victim and his brother, as well as the defendant. Before the shooting, Burton stated, he, Taylor, and the defendant were at Parks's house. Also present was the defendant's uncle, Rodney Galloway. The defendant pulled Burton aside and told him that he needed him to "look out" so he could go kill "Murder," who was also known as Marcus Robinson. Burton stated that he, Taylor, and the defendant rode bicycles to the victim's house. The defendant walked past a porch and went up some steps. Burton turned away, heard three or four shots, and then turned back and saw the defendant return a firearm to his waistband. Burton testified that the three of them fled to a friend's house where the defendant stated that he thought that he had hit someone and displayed a gun. After about ten minutes, Burton testi-

[1]Tayvin Burton and Joshua Taylor had not been granted immunity when they testified before a grand jury.

[2]The parties entered into a stipulation stating that John Parks died in November, 2008.

fied, the three returned to Parks's house. A couple of days later, Burton recounted, the defendant told him that he thought he had killed the victim and had made a mistake. The defendant asked Burton to "stash" the gun, which he did.

About one week later, Burton testified, the defendant and Galloway came to him looking for the gun. According to the defendant, as relayed by Burton, Jarreau Pelote ended up with the gun.

The prosecutor also offered statements made by the defendant before and after the shooting. Galloway testified that, about six hours before the shooting, at Parks's house, the defendant told him that he had a problem with the victim's brother and intended to retaliate. Galloway went on to state that the defendant was looking for a gun. Galloway knew that there was a .380 caliber gun at Parks's house. When Galloway left, the defendant remained at Parks's house.

The next day Galloway saw the defendant on Green Street. The defendant told him that he had "messed up" because the "wrong dude got hit." The defendant had shot at a "shadow," and stated that he had meant to shoot the victim's brother. The defendant relayed that he had tried to fire a fourth shot, but there was a malfunction with the gun. Galloway testified that Pelote ended up with the gun. Galloway testified pursuant to a plea agreement made with Federal prosecutors.[3]

There was evidence that, after the shooting, on August 14, 2008, the defendant ran into Emmanuel Teixera on Green Street. Teixera asked the defendant about the shooting. The defendant responded that he "let off three shots," and had obtained the gun from Galloway. The defendant informed Teixera that the gun since had been sold. Teixera testified pursuant to a plea agreement made with Federal prosecutors.

Kashin Nembhard testified that, sometime in March and April, 2009, he shared a cell with the defendant at the Plymouth County

---

[3]At the end of Rodney Galloway's testimony, the judge instructed the jury that his Federal plea agreement was relevant only to determine his credibility. The judge further advised that the jury could not infer any judgment by the Federal judge with regard to Galloway's character or truthfulness, or conclude from the government's recommendations to the Federal judge that Galloway told the truth.

house of correction. During this time, the defendant told him that he had had an issue with Murder and "another kid named Cam"; had borrowed a gun; and, with Burton and Taylor, had gone to the victim's house. There, the defendant told Nembhard, he had positioned himself by a window and asked Taylor if "this [was] the kid they had beef with," to which Taylor had responded affirmatively. According to Nembhard, the defendant stated that he had pointed the gun at the window and had shot three times. The defendant relayed to Nembhard that he found out later that he had shot the wrong person. The defendant stated that the victim's brother was "running with Murder" and "could get it too." The defendant also told Nembhard that he had used a .380 caliber gun. Nembhard testified pursuant to a plea agreement made with Federal prosecutors.

While the defendant was in custody, his former girl friend and mother of his child telephoned him. The victim had been her friend. The telephone conversation was recorded and the defendant's former girl friend identified the voices as being hers and the defendant's. The defendant told her, "It was not meant for him."

In August, 2008, police officers executed a search warrant at the home of Pelote. There, they recovered a firearm capable of firing .380 caliber ammunition. Testing indicated that the spent projectile recovered from the victim's body came from the gun found inside Pelote's residence.[4]

The defendant did not testify. His trial counsel, in his closing argument, urged the jury to examine the "nature of some of the people" who had testified, including Galloway, Teixera, Nembhard, Burton, and Taylor. Defense counsel argued that each of these witnesses had something to gain from testifying, namely, immunity, a decreased sentence, or an agreement whereby there would be no prosecution of certain charges faced. Defense counsel argued that, in the defendant's conversation with his former girl friend, there was no mention of any names or who was the subject of the conversation. Defense counsel cautioned the jury against speculating.

In his charge to the jury, the judge instructed that they had

---

[4]Galloway identified this gun as the same gun kept by Parks in his home. Burton also identified this gun as the one the defendant had with him at the time of the shooting and that the defendant pulled from his waistband.

wide latitude to wholly believe or disbelieve a witness's testimony, or to accept or reject any particular part of a witness's testimony. On the topic of witness credibility, the judge told the jury that they could consider "any interest a witness may have in the outcome of [the] proceedings" and any bias that the witness may have demonstrated while testifying. The judge further instructed:

> "You heard testimony from witnesses who were granted immunity from prosecution. You may take that into consideration in assessing the witness's credibility. You may also take into consideration whether a witness has been promised some benefit that may have induced him to testify. The defendant cannot be convicted solely on the testimony of a person granted immunity.

> "In this case you heard testimony from witnesses who testified under an agreement with the prosecution in exchange for his truthful testimony. You've heard the testimony of the witnesses who have testified under agreements with the prosecution for that testimony. You should examine each witness's credibility with particular care. You may consider that agreement and any hopes the witness may have as to future advantages from the prosecution in evaluating that witness's credibility along with all the other factors I have already mentioned. You should also consider the fact that the government does not know whether the witness is telling the truth. It is for you, the jury, who will decide whether each of the witnesses is telling the truth."

2. *Discussion.* We first address the defendant's claims that pertain to how the judge "handled" the witness testimony given pursuant to grants of immunity and plea agreements. To summarize, Burton and Taylor testified pursuant to grants of immunity, and Galloway, Nembhard, and Teixera testified pursuant to plea agreements made with Federal prosecutors.

"Testimony offered by a witness in exchange for the government's promise of a plea bargain or immunity should be treated with caution, lest the jury believe that the government has special knowledge of the veracity of the witness's testimony." *Com-*

*monwealth* v. *Marrero*, 436 Mass. 488, 500 (2002). "The danger increases when the jury are informed that the validity of the agreement depends on the truthful nature of the testimony." *Id.* "If properly handled, however, such an agreement does not constitute improper prosecutorial vouching for the witness." *Id.* "In [*Commonwealth* v. *Ciampa*, 406 Mass. 257 (1989)], this court set forth guidelines to be used when a witness testifies pursuant to a plea or immunity agreement that explicitly incorporates a witness's promise to testify truthfully, to minimize the possibility that the jury will believe the witness because the Commonwealth, in effect, has guaranteed the truth of the witness's testimony." *Commonwealth* v. *Marrero*, *supra*, citing *Commonwealth* v. *Ciampa*, *supra* at 264-266.

In *Commonwealth* v. *Washington*, 459 Mass. 32, 44 n.21 (2011), we explained:

> "Where a *Ciampa* instruction is warranted, the following rules apply. A prosecutor may generally bring out on direct examination the fact that a witness has entered into a plea agreement and understands his obligations under it, but any attempts to bolster the witness by questions concerning his obligation to tell the truth should await redirect examination, and are appropriate only after the defendant has attempted to impeach the witness's credibility by showing the witness struck a deal with the prosecution to obtain favorable treatment. *Commonwealth* v. *Ciampa*, [406 Mass. at 264]. A prosecutor in closing argument may then restate the witness's agreement, but commits reversible error if she 'suggests that the government has special knowledge by which it can verify the witness's testimony.' *Id.* at 265. To guard against an implied representation of credibility, the judge must 'specifically and forcefully tell the jury to study the witness's credibility with particular care.' *Id.* at 266, citing *United States* v. *Mealy*, 851 F.2d 890, 900 (7th Cir. 1988). Where the jury are aware of the witness's promise to tell the truth, the judge also should warn the jury that the government does not know whether the witness is telling the truth."

a. The defendant first contends that the judge should not have permitted the prosecutor to elicit from Galloway and Taylor on

direct examination their obligation, respectively under the plea agreement and grant of immunity, to testify truthfully.[5] "Ordinarily, questions concerning an agreement's requirement that a cooperating witness give 'truthful' testimony should be reserved for redirect examination after cross-examination has attacked the witness's credibility based on the . . . agreement." *Commonwealth* v. *Rolon*, 438 Mass. 808, 813 (2003). See *Commonwealth* v. *Ciampa*, 406 Mass. at 264. "However, there is not an absolute prohibition that prevents any and all direct examination reference to the agreement's terms concerning 'truthful' testimony." *Commonwealth* v. *Rolon*, *supra*. Here, in his brief opening statement, although defense counsel did not reference any particular names, he told the jury:

> "You've heard . . . that you're going to be hearing from a number of individuals who have cooperation agreements, they have immunity. So in other words they're coming before you to testify, to tell you some things that they want you to believe but they're not getting their benefit unless they do something for it; unless they rat somebody out; so to speak. So in essence that's the nature of the testimony that you're going to be hearing for much of this case.

> "So the evidence is going to tell you as you hear from these individuals that you have to be very careful of what they tell you. You have to be careful of the motivation that these witnesses have. You have to be careful about whether or not these individuals have had an opportunity to get together on their stories.

> "As you listen to the evidence in this case, I ask that you pay very careful attention, very close attention to what each of these witnesses has to tell you."

Defense counsel's remarks in his opening statement concerning the witnesses testifying pursuant to cooperation agreements

---

[5]After eliciting that Galloway was testifying pursuant to a Federal plea agreement, the prosecutor asked him whether the agreement required him to testify truthfully, to which he replied, "Yes." The prosecutor asked Taylor of his "understanding of what [would] happen if [he did] not testify truthfully [under his grant of immunity]." Defense counsel did not object to these questions.

or grants of immunity essentially served to challenge the witnesses' credibility. In view of this tack, we conclude that there was no error and that no substantial likelihood of a miscarriage of justice occurred when the prosecutor, on direct examination, elicited testimony from Galloway and Taylor about their obligation to tell the truth. See *Commonwealth* v. *Rolon*, 438 Mass. at 813-814 (no error in permitting prosecutor to inquire on direct examination into witness's agreement to provide truthful testimony after defense counsel had attacked witness's credibility during opening statement); *Commonwealth* v. *Marrero*, 436 Mass. at 498-501 (two references during direct examination to witness's obligation to "tell the truth" and her understanding that she could be prosecuted for perjury were not improper vouching); *Commonwealth* v. *Irving*, 51 Mass. App. Ct. 285, 294-295 (2001) (reference during direct examination to obligation to give "truthful" testimony was not premature in light of defense counsel's opening statement emphasizing that plea agreement gave cooperating witness motive to fabricate testimony).

b. In presenting plea agreements to the jury, we have stated that the "preferable" practice is to redact the signatures of the witness's attorney and the prosecutor because "[i]t is possible that the signatures could . . . signal[] to the jury that the prosecutor and [the witness's] attorney [are] attesting to [the witness's] credibility." *Commonwealth* v. *Marrero*, 436 Mass. at 501. We have concluded however, that, in the absence of an objection, "such redaction [is] not required." *Id.* Here, this practice was not followed with regard to the Federal plea agreements, but there was no objection by defense counsel. Also, Federal prosecutors signed the plea agreements here, not any State prosecutors involved in the defendant's case. We conclude that, in these circumstances, no substantial likelihood of a miscarriage of justice arose.

c. The defendant asserts that, in his final charge, the judge should have told the jury that they were not to consider the witnesses' guilty pleas to Federal charges as part of the proof against the defendant. The witnesses who testified pursuant to Federal plea agreements (Galloway, Nembhard, and Teixera), however, were not accomplices and had pleaded guilty to entirely

unrelated crimes. See *Commonwealth* v. *Prater*, 431 Mass. 86, 98 (2000), citing *Commonwealth* v. *Ciampa*, 406 Mass. at 266. There was no error.

d. Although in his final charge the judge instructed the jury to examine the testimony of those witnesses who testified pursuant to plea agreements with "particular care," see *Commonwealth* v. *Ciampa*, 406 Mass. at 266, he did not include this same cautionary instruction in his preceding instruction concerning the testimony of the witnesses who testified under grants of immunity. It would have been preferable for the judge to have done so. See *id.* Looking at the instructions, as we must, in their entirety, see *Commonwealth* v. *Anderson*, 396 Mass. 306, 316 (1985), however, the jury were not left with the impression that the testimony of immunized witnesses somehow should be scrutinized less closely than witnesses who testified pursuant to plea agreements. The jury were provided with thorough instructions concerning the factors to use in determining witness credibility in general; were instructed, in assessing an immunized witness's testimony, that they take into consideration whether the witness had been promised some benefit that may have induced the testimony; and were correctly instructed that they could not convict the defendant based solely on the testimony given pursuant to a grant of immunity, see *Commonwealth* v. *Dyous*, 436 Mass. 719, 727 & n.11 (2002). The omission does not constitute an error requiring reversal.

e. In her closing argument the prosecutor remarked:

> "[T]he witnesses you [heard] from were no angels; far from it. . . . I suggest to you they wanted to tell the truth. According to [Burton], he wanted to tell the truth.
>
> ". . .
>
> "Again, while we're talking about the witnesses, ladies and gentlemen, we've talked about the immunity that two of them received. We've talked about the cooperation agreements that the others have received. I'm going to . . . suggest despite their backgrounds, there is no evidence of a motivation to lie. I suggest to you the incentive is to tell the truth, cooperate pursuant to the

agreement. Look at their agreements. The two people who got immunity are not immune from perjury charges. They get up there on the stand, they still like any other witness have an obligation to tell the truth. They can be prosecuted for perjury in a murder case if they don't."

Contrary to the defendant's contention, the prosecutor's remarks did not amount to improper vouching. As explained in *Commonwealth* v. *Ciampa*, 406 Mass. at 265:

"A prosecutor's position is a delicate one. The prosecutor must be free to argue that such a witness is credible, but may not explicitly or implicitly vouch to the jury that he or she knows that the witness's testimony is true. Vouching can occur if an attorney expresses a personal belief in the credibility of a witness . . . or if an attorney indicates that he or she has knowledge independent of the evidence before the jury verifying a witness's credibility." (Citation omitted.)

Here, the prosecutor did not improperly express her personal belief in the credibility of the immunized witnesses or witnesses who testified pursuant to plea agreements. She argued that the motivation of the witnesses was not to lie, but to tell the truth. There was no error. See *id.* ("a prosecutor may properly point out that an agreement seeking only the truthful cooperation of the witness does not give the witness any special incentive to lie"). Last, the references by the prosecutor and in the plea agreements concerning the possibility of perjury charges on a witness's failure to testify truthfully did not amount to error. See *Commonwealth* v. *Dyous*, 436 Mass. at 725-726; *Commonwealth* v. *Gagliardi*, 29 Mass. App. Ct. 225, 240-241 (1990).

f. Having reviewed the defendant's challenges in isolation, we reject the defendant's contention that the "handling" of the immunized testimony and plea agreements by the judge together with the prosecutor's remarks collectively created a substantial likelihood of a miscarriage of justice.

3. *Relief pursuant to G. L. c. 278, § 33E.* As is our duty, we have examined the record pursuant to G. L. c. 278, § 33E, and discern no basis on which to grant the defendant relief.

*Judgments affirmed.*