COMMONWEALTH *vs.* ANTHONY ROLON.

Bristol. November 8, 2002. - March 13, 2003.

Present: MARSHALL, C.J., GREANEY, SOSMAN, & CORDY, JJ.

*Practice, Criminal,* Agreement between prosecutor and witness, Argument by prosecutor, Plea, Verdict, Capital case. *Evidence,* Credibility of witness. *Witness,* Credibility. *Joint Enterprise. Felony-Murder Rule. Homicide. Robbery. Assault and Battery by Means of a Dangerous Weapon. Armed Assault in a Dwelling. Rules of Criminal Procedure.*

At a murder trial, the prosecutor did not improperly vouch for a witness in his direct examination, where defense counsel's express attack on the witness's credibility during his opening statement, by way of a misstatement as to the contents of a plea agreement, opened the door sufficiently to justify allowing the prosecutor to elicit on direct examination the actual contents of the plea agreement; further, absent objection, the fact that the prosecutor's direct examination of the witness referenced the fact that his plea agreement had been signed by both his lawyer and his mother, possibly signaling to the jury that the witness's credibility was being authenticated, did not require redaction of the signatures. [813-815]

At a murder trial, the prosecutor's closing argument labeling a prosecution witness a liar with respect to only a portion of his testimony did not constitute implicit vouching for the remainder of the witness's testimony. [815-816]

At a murder trial, the prosecutor's closing argument did not, in the circumstances, impermissibly point to a codefendant's promised guilty plea as substantive evidence of the defendant's own guilt as a joint venturer. [816-817]

At a murder trial on the theory of felony-murder, there was sufficient evidence that the defendant had committed the predicate felony of armed burglary, as either a principal or a joint venturer. [817-819]

A criminal defendant was entitled to a required finding of not guilty on indictments charging assault and battery by means of a dangerous weapon and armed assault in a dwelling, where the evidence was insufficient as to principal liability in that there was no evidence that the defendant himself struck the victims or committed any assault while in the dwelling; as to a third charge of armed burglary, since armed burglary served as the predicate felony for a separate conviction of felony-murder, that charge had to be vacated as duplicative. [819-820]

This court concluded that a judge's reduction of a verdict of guilty of murder in the first degree on a theory of felony-murder to murder in the second degree pursuant to Mass. R. Crim. P. 25 (b) (2) constituted an abuse of discretion, and the court reinstated the verdict of murder in the first degree

and declined to grant relief under G. L. c. 278, § 33E, where evidence of provocation would not in any sense detract from evidence that the defendant committed the predicate felony, and was not a proper basis on which to reduce a conviction of felony-murder; where there was no weakness in the evidence of felony-murder in the first degree, no weight of evidence pointing more strongly toward some lesser homicide offense, and no circumstance that mitigated the defendant's culpability for that felony-murder; and where the defendant's age (eighteen years old) was insufficient to justify reduction of the verdict. [820-825]

INDICTMENTS found and returned in the Superior Court Department on February 23, 1996.

The cases were tried before *Charles J. Hely*, J., and a motion seeking reduction of the verdict of guilty of murder in the first degree was heard by him.

*John F. Palmer* for the defendant.

*Kevin Connelly*, Assistant District Attorney (*Steven E. Gagne*, Assistant District Attorney, with him) for the Commonwealth.

SOSMAN, J. The defendant was convicted of felony-murder in the first degree, with armed burglary as the predicate felony.[1] He was also convicted of two counts of assault and battery by means of a dangerous weapon, armed assault in a dwelling, home invasion, and armed burglary. The defendant filed a motion pursuant to Mass. R. Crim. P. 25 (b) (2), 378 Mass. 896 (1979), seeking reduction of the murder verdict. The trial judge allowed the motion and reduced the verdict to murder in the second degree. The Commonwealth appeals from the judge's order reducing the verdict. The defendant appeals from his convictions[2] and asks this court to order a new trial or to further reduce the verdict to manslaughter pursuant to G. L. c. 278, § 33E. For the following reasons, we affirm the conviction of murder in the first degree, reverse the order reducing the degree of guilt, reverse the convictions of assault and battery by means of a dangerous weapon and armed assault in a dwelling, vacate

---

[1] The jury found the defendant not guilty on the alternative theory of deliberate premeditation.

[2] The conviction of home invasion was placed on file with the defendant's consent, and is therefore not before us. See *Commonwealth* v. *Frey*, 390 Mass. 245, 246 (1983), citing *Commonwealth* v. *Delgado*, 367 Mass. 432, 438 (1975).

as duplicative the conviction of armed burglary, and decline to grant relief pursuant to G. L. c. 278, § 33E.

1. *Facts.* The defendant's convictions stem from an incident in which a group of armed men stormed an apartment in a New Bedford housing project in retaliation for an earlier confrontation involving some of the apartment's occupants. Three persons in the apartment — Robert Botelho, Matthew Grant, and Anthony Mullen — were stabbed in the course of the ensuing melee. Botelho died from his injuries. Grant and Mullen survived. The Commonwealth's theory was that Rolon was the principal instigator of the group's attack on the apartment and that he was the one who fatally stabbed Botelho during the course of that attack.

On the evening of January 20, 1996, Botelho, Mullen and Grant were visiting the apartment of Botelho's girl friend, Natasha Azevedo. Azevedo lived in the apartment with her two-year old son, her sister Tiffany, and her cousin, Desiree Gibbs. After some period of drinking, the three men and three women decided to go to a party being held at a nearby apartment in the housing project. There was some concern about potential friction between Botelho and other guests who might be at the party, and the three men therefore armed themselves: Mullen with a "steak fork," Grant with a hammer, and Botelho with a pistol. Botelho's pistol, although it appeared real, had a plug in the barrel and was incapable of firing. After leaving Azevedo's baby with a next door neighbor, the group proceeded to the party at around 11 P.M.

At the party, a fight erupted between Mullen and one of the other guests. During that altercation, Botelho pulled out his gun, waved it around, and told everyone to "get off [his] boy." The defendant, Anthony Rolon, arrived shortly before the end of the fight and began arguing with Botelho. Rolon complained that Botelho would "bring the cops around" where he, Rolon, was "trying to make money." During that argument, Botelho pulled his gun out, waved it around, and repeatedly pointed it at Rolon. In response, Rolon stretched out his arms and told Botelho to "come on, go ahead." Various friends intervened, convinced Botelho to put the gun away and leave, and escorted Botelho and his companions back to Azevedo's apartment to make

certain that they left. However, despite the efforts to separate Botelho from Rolon, Rolon and a few of his friends followed close behind. Rolon continued shouting at Botelho ("Come on, you're a big man, go ahead"). When they reached Azevedo's apartment, words continued to be exchanged, with Rolon yelling for Botelho to come out and fight. Botelho ultimately told them to leave, and went inside Azevedo's apartment. One of Rolon's friends yelled out, "We'll be back." Rolon's group then left, and all was quiet for some ten to twenty minutes thereafter.

During that interval of time, Rolon's group joined up with a larger group of some fifteen to twenty young men. Most of them were armed, carrying knives, bats, shovels, hammers, sticks, and frying pans. As they assembled slightly down the hill from Azevedo's apartment, someone asked what they were doing. An unidentified member of the group replied, "We're [going to] take care of something." Others were heard asking who had pulled a gun on Rolon. Rolon said that he "was going to get the kid" with the gun. Various people who had been at the earlier party saw the armed group and attempted to dissuade Rolon, telling him and his companions that they should "just drop it . . . just leave it alone," that "the person's gone, he's left," and "[t]here's no more reason to fight." However, Rolon did not respond, and "nobody seemed to listen." Anticipating trouble, one partygoer went to telephone the police.

Rolon, at the head of one group, proceeded up the hill in the direction of Azevedo's apartment, while a smaller group broke off and approached the apartment by a different route. As they reached the apartment, one group went around to the back while the other remained in front. The attack began by smashing the apartment windows with a rock, a board, and a shovel. Botelho, Mullen, and Grant rushed out the back door. Botelho, carrying his inoperable gun, ran at one of his attackers and struck him with the gun. However, the gun fell to the ground, and someone called out that the gun was a "fake." Grant grabbed Botelho and rushed back toward the apartment. Rolon and one of his companions, Hidekel "Kelly" Hernandez, chased after Botelho and caught up with him just outside the back door. Hernandez began hitting Botelho; Rolon stabbed him several times. Botelho

went back inside the apartment, and ultimately collapsed in the living room.

Meanwhile, other members of Rolon's group were fighting with Mullen outside. Mullen was hit with a shovel and cut with a knife. When he made his way back inside the apartment, he was assaulted by yet another intruder with a knife. Others pushed their way through the back door and caught up with Grant, who had managed to get inside as far as the living room. Surrounded by attackers who had him pinned down on the couch, Grant was struck in the head with the handle of a hammer and stabbed in the buttocks and thigh, severing an artery. Versions differed as to the identity of the individuals who stabbed Mullen and Grant, and versions differed as to whether Rolon himself had ever been inside the apartment at any point.[3] By all accounts, the scene was chaotic, and most of the perpetrators were never identified.

The attack ended when one of the intruders yelled out "five-o" (a reference to the imminent arrival of the police) and the group fled. Rolon and several others regrouped at a friend's apartment shortly thereafter. Hernandez, whose hands were bloody, reported that he had gotten "the kid inside the house good," and Rolon bragged that "he got that kid good with the gun."

Botelho was still alive when police arrived at the scene, but he succumbed shortly thereafter. He had three deep stab wounds

---

[3]Natasha Azevedo had run out the front door when the attack began, where she saw "people coming from everywhere" and one group headed around back. She followed them to the rear of the building, and saw a group of six people at the back door going into the apartment. She identified Rolon as one of those six, and testified that the entire group went inside. However, she did not specifically see Rolon go through the doorway "because there was a few people around him." In her subsequent statement to police at the scene (introduced as a spontaneous utterance), Azevedo identified Rolon as one of the attackers "in" her house. However, when Azevedo herself went inside the apartment, she did not actually see Rolon anywhere in the apartment, nor did any other witness identify Rolon as one of the many intruders inside the apartment. At trial, Azevedo testified that she had never seen Rolon "in" the dwelling, and that her spontaneous utterance identifying him as having been "in" the apartment was incorrect. Eddie Torres, the sole witness who identified Rolon as the one who had stabbed Botelho, testified that the stabbing occurred just outside, up against the back door, and that Rolon "left" after the stabbing.

in the chest, the fatal wound being to the heart. He had also sustained blunt force injuries and lacerations to the head, neck, shoulders, back, arm, thigh, and hands.

2. *Vouching for credibility of a witness.* One of the participants in the storming of Azevedo's apartment, Eddie Torres, was a juvenile at the time. Pursuant to a plea agreement, he pleaded to being delinquent by reason of murder in the second degree and testified for the prosecution at Rolon's trial. Although other witnesses described Rolon's role in the events leading up to the attack and confirmed his identity as one of the group of attackers, Torres was the only eyewitness to testify that it was Rolon who actually stabbed Botelho. On appeal, Rolon contends that the prosecutor improperly vouched for Torres in his direct examination and again in closing argument. We disagree.

During the direct examination of Torres, the prosecutor elicited the fact that Torres had a plea agreement. He then asked Torres whether he had agreed to provide "complete and truthful and accurate testimony," to which Torres replied, "Yes." In one subsequent question concerning the agreement, the prosecutor phrased the question in a fashion that made reference to the obligation to give "complete, truthful and accurate" testimony. The defendant objected to both questions; both objections were overruled.

Ordinarily, questions concerning an agreement's requirement that a cooperating witness give "truthful" testimony should be reserved for redirect examination after cross-examination has attacked the witness's credibility based on the plea agreement. See *Commonwealth* v. *Rivera*, 430 Mass. 91, 96-97 (1999); *Commonwealth* v. *Ciampa*, 406 Mass. 257, 264 (1989). However, there is not an absolute prohibition that prevents any and all direct examination reference to the agreement's terms concerning "truthful" testimony. See, e.g., *Commonwealth* v. *Marrero*, 436 Mass. 488, 498-500 (2002) (two references during direct examination to witness's obligation to "tell the truth" and her understanding that she could still be prosecuted for perjury did not amount to improper vouching); *Commonwealth* v. *Irving*, 51 Mass. App. Ct. 285, 294-295 (2001) (reference during direct examination to obligation to give "truthful, complete and accurate testimony" was not premature in light of

defense counsel's opening statement emphasizing that plea agreement gave cooperating witness motive to fabricate testimony).

Here, the attack on Torres's credibility in connection with the plea agreement had been mounted in explicit terms in defense counsel's opening statement. Defense counsel told the jury that the entire case depended on the credibility of Torres, that they could not convict Rolon unless they "believe[d] everything Torres tells [them] about what happened," and that they would hear evidence of Torres's agreement with the prosecution. Defense counsel then described the terms of that plea agreement as follows: "[H]e has got to tell you that Kelly Hernandez and Anthony Rolon killed Robert Botelho. If he doesn't tell you that, he has no agreement." Thus, by the time of Torres's direct examination, the jury had already heard a significant mischaracterization of what his obligation under the agreement was, i.e., that the agreement identified specific details that Torres was required to include in his testimony. Such an express attack on Torres's credibility, by way of a misstatement as to the contents of the plea agreement, opened the door sufficiently to justify allowing the prosecutor to elicit on direct examination the actual contents of the plea agreement. General references in an opening statement to a witness's bias or motive because of the mere existence of a plea agreement would not be sufficient to avoid the requirement that questioning on the agreement's stated obligation of "truthful" testimony await redirect examination. See *Commonwealth* v. *Rivera, supra; Commonwealth* v. *Ciampa, supra.* However, defense counsel's own references to the purported contents of the plea agreement, particularly where those references included an erroneous characterization of the agreement's terms, are sufficient.[4] See *Commonwealth* v. *Irving, supra* at 295.

Rolon also complains that the prosecutor's direct examination of Torres referenced the fact that his plea agreement had been signed by both his lawyer and his mother. See *Commonwealth*

[4]While it would be a better practice for the prosecutor to ask at sidebar for permission to elicit such testimony on direct examination, failure to seek permission in advance does not alter the fact that, on this record, ample grounds for eliciting the testimony on direct examination were present.

v. *Marrero, supra* at 501 ("preferable" practice to redact signatures of attorney and prosecutor before submitting agreement to jury because "[i]t is possible that the signatures could have signaled to the jury that the prosecutor and [the witness's] attorney were attesting to [the witness's] credibility," but such redaction "not required" in absence of objection). Here, as in *Commonwealth* v. *Marrero, supra,* there was no objection to the evidence of the signatures, and the judge was not required to strike the evidence sua sponte. Moreover, the references to the signatures were not made in a context that would impermissibly suggest any attestation of the witness's credibility. Rather, the questions now complained of arose for purposes of authenticating the agreement and refreshing Torres's memory when he initially testified that he did not even recognize the agreement.[5]

Separate and apart from his arguments concerning the use of the plea agreement, the defendant moved for a mistrial on the ground that the prosecutor's closing argument contained impermissible vouching for Torres when the prosecutor acknowledged that Torres had "lied" about his own participation in the event.[6] A prosecutor does not, in any sense, "vouch" for a witness by conceding that the witness has "lied." However, the defendant contends that the prosecutor's labeling Torres a

---

[5]We are also satisfied that the evidence of the plea agreement introduced during the direct examination of Torres did not violate the fundamental concern of *Commonwealth* v. *Ciampa,* 406 Mass. 257, 264 (1989), namely, that the jury not be led to believe that the prosecution has some superior ability to ascertain whether the witness's testimony is truthful. Here, the references to Torres's obligation to give truthful testimony were few and fleeting, not repeated or dwelt upon; the agreement itself was not even admitted in evidence; the prosecutor's opening statement and closing argument repeatedly and expressly disavowed any vouching for any of the witnesses; the prosecutor's closing argument stressed that the jury should "take a good, hard look" at any testimony given pursuant to a plea agreement, because such an agreement can "completely color[]" that person's testimony; and the judge gave a thorough and forceful instruction in accordance with *Commonwealth* v. *Ciampa, supra* at 266, admonishing them to consider Torres's testimony with "particular caution and care" due to the potential "improper influence" of his plea agreement and telling them that the Commonwealth had no way of knowing whether a witness's testimony was truthful.

[6]Torres denied that he had carried any weapon and denied that he had stabbed Grant, claiming that he had been pulled away by Tiffany Azevedo when he tried to "hit" Grant. However, eyewitnesses saw Torres on top of Grant on the couch and saw a knife in his hand, and that same hand was bloody.

liar with respect to only a portion of his testimony implicitly vouched for the remainder of Torres's testimony. Following a defense closing that had pointed to Torres's incredible minimization of his own role in the event, we see no such implicit vouching in the prosecutor's acknowledgment that Torres was "a horrible witness" who should not be believed whenever other witnesses provided contrary evidence but who should be believed with respect to those details that were supported by other evidence. This is a permissible — indeed a common — approach to the problem of a witness who has been shown to be less than truthful on certain aspects of his or her testimony: admit the dishonesty or inaccuracy that has been demonstrated by more reliable evidence, and point to the existence of evidence that corroborates other portions of the witness's testimony that would make it reasonable to credit those other portions. It is not improper vouching for the prosecutor to point to reasons why a witness's testimony, or portions of a witness's testimony, should logically be believed. See *Commonwealth* v. *Chavis*, 415 Mass. 703, 713-714 (1993).

3. *Torres's guilty plea.* Rolon contends that the prosecutor's closing argument impermissibly pointed to Torres's promised guilty plea as substantive evidence of Rolon's own guilt as a joint venturer. A codefendant's guilty plea is not admissible to prove the guilt of the defendant. See *Commonwealth* v. *Martinez*, 425 Mass. 382, 398-399 (1997); *Commonwealth* v. *Powell*, 40 Mass. App. Ct. 430, 436 (1996). However, contrary to the defendant's argument, that is not how Torres's proposed plea was used or argued. Rather, it was used and argued to address a separate issue that had been raised during the cross-examination of Torres. Defense counsel had pointed out that, while Torres claimed that he had not stabbed Botelho, he had nevertheless agreed to plead guilty to murder in the second degree in connection with Botelho's death. That ostensible discrepancy was then used repeatedly as an illustration of Torres's willingness to "lie" in order to obtain the benefits of his plea agreement. To put that discrepancy in context, the prosecutor's closing argument asked the jury to consider the concept of joint venture in connection with their assessment of "why it is that Eddie Torres is pleading guilty," and reminded

them that Torres was represented by a lawyer at the time of his agreement.[7] This reference did not suggest to the jury that Torres's plea on a joint venture theory added weight to the Commonwealth's joint venture theory against Rolon. Rather, it was used to point out that Torres could be guilty of murder even though he had not stabbed Botelho, and that his guilty plea therefore was not inconsistent with his assertion that he did not stab Botelho. There was no objection, and this brief reference to a theory that would harmonize Torres's plea with his denial of individual guilt does not give rise to any substantial likelihood of a miscarriage of justice.

4. *Motion for required findings of not guilty.* a. *Felony-murder.* The defendant contends that the judge erroneously denied his motion for required finding of not guilty on the charge of felony-murder, and claims that there was insufficient evidence that he had committed the predicate felony of armed burglary, as either a principal or a joint venturer.[8] Rolon acknowledges that there was evidence that he stabbed Botelho, but, where he attacked Botelho outside the apartment, without ever having entered the apartment, he argues that he did not himself commit any armed burglary.[9] Rolon's argument concerning insufficient evidence of his liability as a principal is easily disposed of, as felony-murder was ultimately submitted to the jury solely on a theory of joint venture.[10] As to the alternative theory of joint venture, he contends that the evidence was insuf-

[7]At the reference to Torres's lawyer, the judge interrupted the closing argument and told the prosecutor to "move on."

[8]The statute, G. L. c. 266, § 14, defines two forms of armed burglary. Both forms require proof that the defendant committed a breaking and entering of a dwelling at night, with intent to commit a felony, while a person is lawfully within the dwelling. The remaining element consists of either of the following: (1) that the defendant was armed with a dangerous weapon (or became armed after entering), *or* (2) that the defendant actually assaulted a person who was lawfully in the dwelling. G. L. c. 266, § 14. See *Commonwealth* v. *Gordon,* 42 Mass. App. Ct. 601, 603 (1997).

[9]Contrary to his argument, there was some evidence to support the inference that Rolon had entered the dwelling at some point during the incident. See note 3, *supra.*

[10]The judge gave the jury oral and written instructions, both of which described only a joint venture theory for felony-murder; and the heading on the written instructions for felony-murder entitled that section "FIRST DEGREE FELONY MURDER: BY JOINT VENTURE PARTICIPATION IN

ficient to prove that he shared any intent with the perpetrators who did enter the premises and commit the armed burglary. However, the evidence amply supported the inference that retaliation for Botelho's earlier assault on Rolon was the entire purpose of the venture; that Rolon was the one who had attempted to lure Botelho out of the apartment to engage in a retaliatory fight; and that, unsuccessful in that attempt, he had accompanied his obviously armed companions back to the apartment to storm it by force, spurning the attempts of those who were seeking to dissuade him from carrying the dispute further. There was ample evidence of Rolon's shared intent.

Rolon also argues that, because the fatal stabbing occurred just outside the apartment without the need for him to enter the premises, Botelho's death did not occur in connection with the predicate felony.[11] However, it was the breaking of the premises by the joint venturers — the smashing of windows preparatory to entering the apartment — that drove Botelho outside to confront his attackers. He was then stabbed on the threshold, as the attackers were chasing him back inside the apartment. During an armed burglary, and certainly during an armed burglary by this many perpetrators, it is readily foreseeable that some victims will attempt to flee the premises, or will go outside to try to prevent the entry. The killing of such a victim occurs in connection with the armed burglary, without regard to whether the precise location of the killing is within or without the

---

AN ARMED BURGLARY WITH AN INTENT TO COMMIT AN ARMED BEATING ON A PERSON LAWFULLY INSIDE." At no point was the jury instructed to consider felony-murder on anything other than a theory of joint venture.

[11]In his brief, Rolon cites to cases requiring that the killing be a "natural and probable consequence" of the defendant's commission of the predicate felony. See *Commonwealth* v. *Nichypor*, 419 Mass. 209, 215 (1994); *Commonwealth* v. *Ortiz*, 408 Mass. 463, 469 (1990); *Commonwealth* v. *Matchett*, 386 Mass. 492, 505 (1982). In the Model Jury Instructions on Homicide, the court has recommended that that language not be used, as it is superfluous to the other elements of felony-murder. Model Jury Instructions on Homicide at 67-68 n.8 (1999). Using the terminology of the Model Instructions, the killing must occur "in connection with the felony and at substantially the same time and place," and the felony itself must be either inherently dangerous to human life or committed with a conscious disregard for the risk to human life. *Id.* at 16, 17-18.

dwelling. That is precisely what happened to Botelho, and Rolon's attempt to dissociate the killing from the predicate felony based on the fortuity that he caught up with Botelho on the threshold of the apartment is unpersuasive.

b. *Other charges.* Rolon contends that he was entitled to a required finding of not guilty on the other charges against him (assault and battery by means of a dangerous weapon on Grant and Mullen, armed assault in a dwelling, and armed burglary). The defendant's motion for required findings of not guilty focused mainly on the argument that there was insufficient evidence of joint venture liability, but did also assert that there was no evidence of Rolon's liability as a principal for those other crimes.[12] The motion was denied, and these indictments were submitted to the jury on theories of both joint venture and principal liability.[13] For the reasons discussed above, the evidence as to Rolon's participation in a joint venture was adequate. However, Rolon is correct that the evidence was insufficient as to principal liability for these other crimes.

With respect to the indictment charging assault and battery by means of a dangerous weapon on Mullen and Grant, there was no evidence that Rolon himself struck either of those victims. With respect to the indictment charging armed assault in a dwelling, the statutory definition of that crime requires proof that the defendant "being armed with a dangerous weapon, enter[ed] a dwelling house and *while therein* assault[ed] another with intent to commit a felony" (emphasis added). G. L. c. 265, § 18A. While the jury could infer that Rolon had "entered" the dwelling amidst the group observed by Azevedo (see note 3, *supra*), there was no evidence that Rolon himself

---

[12]"[A] generally phrased motion for [required finding of not guilty] does not preserve for review the denial of the motion on a specific theory of liability when there was sufficient evidence to withstand the motion on an alternative theory." *Commonwealth* v. *Berry*, 431 Mass. 326, 331 (2000).

[13]Both the oral instructions and the written instructions pertaining to these indictments defined the elements in terms of principal liability, and the jury were generally instructed that a joint venture theory could be considered as to all crimes charged. Unlike the instructions on felony-murder, nothing in the instructions operated to limit the jury to a joint venture theory for these indictments.

committed any assault while in the dwelling.[14] The verdict slip did not require the jury to specify whether they found the defendant guilty of these crimes based on the supportable theory of joint venture or based on the unsupportable theory of principal liability, and we therefore must reverse the convictions and set aside the verdicts on those indictments. See *Commonwealth* v. *Flynn*, 420 Mass. 810, 818 (1995).

With respect to the remaining indictment charging armed burglary, that armed burglary served as the predicate felony for the felony-murder conviction, and it therefore must be vacated as duplicative. See *Commonwealth* v. *Gunter*, 427 Mass. 259, 275-276 (1998).

5. *Rule 25 (b) (2) motion.* The judge allowed in part Rolon's rule 25 (b) (2) motion, reducing the verdict to murder in the second degree. The Commonwealth appeals from that order, seeking reinstatement of the jury's verdict of murder in the first degree, and Rolon asks us to reduce the verdict further pursuant to G. L. c. 278, § 33E. We agree with the Commonwealth that reduction of this verdict constituted an abuse of discretion. We therefore reinstate the verdict of murder in the first degree and decline to grant relief under G. L. c. 278, § 33E.

Pursuant to rule 25 (b) (2), a trial judge has the authority to reduce a verdict, despite the presence of evidence sufficient to support the jury's original verdict. See *Commonwealth* v. *Woodward*, 427 Mass. 659, 666-667 (1998), and cases cited. That power is comparable to the power vested in this court pursuant to G. L. c. 278, § 33E, and a trial judge's decision on a rule 25 (b) (2) motion "should be guided by the same considerations." *Commonwealth* v. *Gaulden*, 383 Mass. 543, 555 (1981). The purpose behind the grant of such power to a judge is "to ensure that the result in every criminal case is consonant with justice." *Commonwealth* v. *Woodward, supra* at 666. See *Commonwealth* v. *Ghee*, 414 Mass. 313, 321 (1993); *Commonwealth* v. *Keough*, 385 Mass. 314, 320 (1982). "[A] judge should use this power sparingly," *Commonwealth* v.

---

[14]The indictment specified that the occupants of the dwelling allegedly assaulted were Mullen, Grant, and Botelho. Again, there was no evidence that Rolon himself had struck either Mullen or Grant, and his assault on Botelho occurred outside the dwelling.

*Woodward, supra* at 667, and not sit as a "second jury." *Commonwealth* v. *Keough, supra* at 321. We will not disturb a judge's order reducing a verdict unless the judge abused his discretion or committed an error of law. *Commonwealth* v. *Woodward, supra* at 668, quoting *Commonwealth* v. *Millyan*, 399 Mass. 171, 188 (1987).

A judge's discretion to reduce a verdict pursuant to rule 25 (b) (2) is appropriately exercised where the weight of the evidence in the case, although technically sufficient to support the jury's verdict, points to a lesser crime. Thus, for example, where evidence of premeditation was "slim," the judge did not abuse his discretion in reducing a verdict of murder in the first degree to murder in the second degree. See *Commonwealth* v. *Ghee, supra* at 322. See also *Commonwealth* v. *Millyan, supra* at 188-189 (verdict reduction appropriate where evidence of intoxication undermined theory of deliberate premeditation).[15] Similarly, where the weight of the evidence suggests that the defendant did not act with malice, a murder verdict may appropriately be reduced to manslaughter. See *Commonwealth* v. *Woodward, supra* at 669-671 & n.14; *Commonwealth* v. *Cobb*, 399 Mass. 191, 192 (1987); *Commonwealth* v. *Keough, supra* at 320-321; *Commonwealth* v. *Gaulden, supra* at 557-558; *Commonwealth* v. *Greaves*, 27 Mass. App. Ct. 590, 594 (1989).[16] In some cases, weaknesses in the evidence supporting the jury's

---

[15]Weakness in the evidence of deliberate premeditation has similarly prompted this court to exercise its authority under G. L. c. 278, § 33E, and reduce convictions of murder in the first degree to murder in the second degree. See *Commonwealth* v. *Lanoue*, 392 Mass. 583, 591-592 (1984); *Commonwealth* v. *Dalton*, 385 Mass. 190, 196-197 (1982); *Commonwealth* v. *King*, 374 Mass. 501, 507-508 (1978); *Commonwealth* v. *Cadwell*, 374 Mass. 308, 316-318 (1978).

[16]Where the weight of the evidence suggested that a defendant did not act with malice, this court has reduced murder verdicts to manslaughter under G. L. c. 278, § 33E. See *Commonwealth* v. *Seit*, 373 Mass. 83, 95 (1977) (weight of evidence was that killing occurred as result of excessive force in self-defense or on provocation and was therefore not murder); *Commonwealth* v. *Mahnke*, 368 Mass. 662, 701-702 (1975), cert. denied, 425 U.S. 959 (1976) (where death caused by victim's head hitting curb after single blow from defendant, evidence was weak with respect to any prong of malice); *Commonwealth* v. *Kinney*, 361 Mass. 709, 711-713 (1972) (defendant under attack by crowd at time he fired weapon); *Commonwealth* v. *Ransom*, 358 Mass. 580, 583 (1971) (evidence was that killing occurred during "heat of a sudden affray"); *Commonwealth* v. *Baker*, 346 Mass. 107, 119 (1963) (same).

verdict were coupled with trial error that may have influenced the jury's assessment of the issue. See *Commonwealth* v. *Woodward, supra* at 671 (although evidence suggested that defendant did not act with malice, jury not instructed on manslaughter); *Commonwealth* v. *Millyan, supra* at 188-189 (evidence of intoxication undermined theory of deliberate premeditation, but jury not instructed on issue of impairment due to intoxication). What is not justified, however, is reduction to a lesser verdict that would be inconsistent with the weight of the evidence, or reduction based solely on factors irrelevant to the level of offense proved. See *Commonwealth* v. *Sabetti*, 411 Mass. 770, 780-781 (1992) (failure to prove that defendant knew weight of cocaine did not justify reduction of verdict of trafficking in cocaine to possession with intent to distribute, because defendant's knowledge of weight irrelevant to offense); *Commonwealth* v. *Burr*, 33 Mass. App. Ct. 637, 640-644 (1992) (error to reduce verdicts of trafficking in cocaine to possession with intent to distribute in absence of evidence that quantity of cocaine was below trafficking level).

We look, therefore, to determine whether there was some weakness in the evidence that Rolon committed felony-murder in the first degree, or evidence suggesting that he more likely committed some lesser form of homicide. If, as we conclude, the weight of the evidence is entirely consistent with felony-murder in the first degree, it is an abuse of discretion to reduce the verdict solely on factors unrelated to the weight of the evidence.

Here, the judge provided a written memorandum outlining his reasons for reducing the verdict to murder in the second degree. See *Commonwealth* v. *Gaulden, supra* at 556 (judge should state reasons for reducing verdict). Those reasons were that Botelho had pointed a gun at Rolon earlier in the evening (such that the purpose of the armed burglary was "violent retaliation"), with Rolon only becoming aware of the fact that the gun was inoperable sometime after the attack on the apartment was underway; that Rolon stabbed Botelho outside the house "before the intruders entered" and never went inside the house himself; and that Rolon was only eighteen years of age at the time of the murder. These stated reasons do not provide an adequate basis for reducing the verdict to murder in the second degree.

By his reference to Botelho's being the initial aggressor with a weapon earlier that night, the judge was invoking a theory of provocation as a means of reducing the degree of felony-murder. While provocation resulting in a heat of passion would operate to negate malice, it is not germane to felony-murder, where malice need not be shown. For felony-murder, the intent to commit the predicate felony substitutes for malice. See *Commonwealth* v. *Moran*, 387 Mass. 644, 649 (1982), and cases cited. Evidence of provocation would not in any sense detract from evidence that the defendant committed the predicate felony and is not a proper basis on which to reduce a conviction of felony-murder.[17]

The next factor cited by the judge is, in substance, a rejection of the doctrine of joint venture as it applies to felony-murder.

[17]Moreover, even if provocation were relevant to a charge of felony-murder, the weight of the evidence does not suggest that there was adequate provocation. While the earlier confrontation with Botelho, which included Botelho's pointing a gun at Rolon, would ordinarily constitute adequate provocation, Rolon was apparently unafraid of Botelho's weapon — he taunted Botelho to shoot, followed him up the hill with further taunts, and sought (unsuccessfully) to lure this ostensibly armed man out to fight. This evidence does not suggest fright, panic, or sudden impulsive conduct on Rolon's part. Rolon's reason for being upset at the earlier fight and at Botelho's pulling a gun during that fight — namely, that it would bring police to the scene and interfere with Rolon's ability to "make money" — would obviously not constitute adequate provocation. Then, the confrontation between Rolon and Botelho (which Rolon had sought to prolong, not to end) broke off when Botelho refused to come out and fight. Rolon withdrew for the purpose of joining up with a large number of armed young men, vastly outnumbering his intended victims, and deliberately ignored those who sought to convince him that Botelho's departure from the scene should end the matter without further violence. Rolon's "violent retaliation" occurred only after a lengthy opportunity — and after repeated advice — to "cool down." See *Commonwealth* v. *Andrade*, 422 Mass. 236, 237 (1996), quoting *Commonwealth* v. *Schnopps*, 383 Mass. 178, 180 (1981), *S.C.*, 390 Mass. 722 (1984) (killing must follow provocation "before sufficient time had elapsed for the accused's temper to cool"); *Commonwealth* v. *McLeod*, 394 Mass. 727, 738, cert. denied sub nom. *Aiello* v. *Massachusetts*, 474 U.S. 919 (1985) (provocation evidence must show that reasonable person "would not have 'cooled off' by the time of the homicide"). In similar situations, where a defendant has left the scene of an earlier confrontation only to return later with a weapon in order to exact vengeance, we have repeatedly declined to grant relief under G. L. c. 278, § 33E. See *Commonwealth* v. *Whipple*, 377 Mass. 709, 715 (1979); *Commonwealth* v. *Stillwell*, 366 Mass. 1, 5-6 (1974), cert. denied sub nom. *McAlister* v. *Massachusetts*, 419 U.S. 1115 (1975), and cases cited.

The judge's conclusion that Rolon himself did not go into the apartment (and thus did not personally complete any armed "entry" into the occupied dwelling) is irrelevant to Rolon's status as a joint venturer in the predicate felony of armed burglary.[18] We recognize that the doctrines of felony-murder and joint venture may, on some hypothetical fact patterns, produce a conviction of murder in the first degree that would appear out of proportion to a defendant's culpability. It may in some circumstances seem harsh to convict a defendant of murder in the first degree if the defendant was on the remote outer fringes of a joint venture to commit some felony that satisfied the felony-murder rule in only some hypertechnical way. We will assume, without deciding, that reduction of a verdict in such circumstances could be appropriate under rule 25 (b) (2).[19] This case, however, does not present such circumstances. Rolon was not on the periphery of this joint venture — he was at its center and the very reason for its existence. The predicate felony here, armed burglary, is inherently dangerous to human life, see *Commonwealth* v. *Jackson*, 432 Mass. 82, 89-90 (2000), and the

---

[18]Nor is there any issue of the predicate felony merging with the assault that caused the homicide, as there were multiple intended victims of the armed burglary. See *Commonwealth* v. *Kilburn*, ante 356, 358-359 (2003).

[19]This court has reduced convictions of murder in the first degree predicated on felony-murder only where the evidence suggested that the felony intended by the defendant would not suffice for felony-murder in the first degree. See *Commonwealth* v. *Williams*, 364 Mass. 145, 146, 151-152 (1973) (evidence that defendant distracted victim while codefendant sought to remove money from victim's pocket, with killing occurring suddenly when victim realized what defendants were doing, suggested that defendant intended "to steal surreptitiously, not by violence as in a robbery," thus making conviction of felony-murder in first degree contrary to weight of evidence); *Commonwealth* v. *Rego*, 360 Mass. 385, 394-396 (1971) (evidence suggested breaking and entering to steal money from vending machines after hours when factory building would likely be vacant; murder of security guard occurring during that breaking and entering would be only murder in second degree; reduction of verdict of murder in first degree appropriate, especially where judge failed to give jury option of felony-murder in second degree). See also *Commonwealth* v. *White*, 353 Mass. 409, 424-425 (1967), cert. denied, 391 U.S. 968 (1968) (reducing verdict where theories of felony-murder in both first and second degrees submitted to jury without defining elements of predicate felonies for either degree of murder). This court's power under G. L. c. 278, § 33E, has never been exercised to relieve a defendant of the consequences of participation in a felony that does qualify as the predicate for felony-murder in the first degree.

circumstances of this particular armed burglary — some twenty or more armed men forcibly invading an apartment to attack the hopelessly outnumbered occupants — made it extremely dangerous to human life. Nor was Rolon in any sense removed from that portion of the felony that resulted in the killing. To the contrary, he was the one who committed the actual killing. There was thus no weakness in the evidence of felony-murder in the first degree, no weight of evidence pointing more strongly toward some lesser homicide offense, and no circumstance that mitigated Rolon's culpability for that felony-murder.

The judge's final factor — Rolon's age — is insufficient to justify reduction of the verdict. A defendant's personal circumstances may be considered in conjunction with the evidence that points to a lesser degree of guilt, but personal circumstances alone do not justify reduction of a verdict. See *Commonwealth* v. *Brousseau,* 421 Mass. 647, 655-657 & n.7 (1996); *Commonwealth* v. *Almon,* 387 Mass. 599, 607-608 (1982); *Commonwealth* v. *Haywood,* 377 Mass. 755, 771 (1979); *Commonwealth* v. *Burr,* 33 Mass. App. Ct. 637, 642-643 (1992).

Although not relied on by the judge as a factor justifying reduction of the verdict, Rolon argues that none of the other defendants charged in connection with this homicide was convicted of murder in the first degree. The fact that separate trials against other defendants reached differing results does not by itself justify reduction of a defendant's verdict. See *Commonwealth* v. *Brousseau, supra* at 656; *Commonwealth* v. *Tavares,* 385 Mass. 140, 159, cert. denied, 457 U.S. 1137 (1982), quoting *Commonwealth* v. *Pisa,* 372 Mass. 590, 597, cert. denied, 434 U.S. 869 (1977).[20]

6. *Conclusion.* We therefore affirm the conviction of murder

---

[20]The record indicates that the evidence of other participants' involvement — and even their identification — was sketchy. This may well explain why two defendants were acquitted of all charges, two were convicted of manslaughter, one was convicted of murder in the second degree (which the judge reduced to manslaughter), one pleaded guilty to manslaughter, and another pleaded guilty to a delinquency complaint of murder in the second degree. This court has considered inconsistent results as a factor in the decision to reduce a verdict where a more clearly culpable codefendant has been convicted of (or pleaded guilty to) a lesser offense. See *Commonwealth* v. *Tavares,* 385 Mass. 140, 158-159, cert. denied, 457 U.S. 1137 (1982); *Commonwealth* v. *Vanderpool,* 367 Mass. 743, 750 (1975). Rolon, however, was

in the first degree, reverse the order reducing the verdict to murder in the second degree, and decline to grant relief pursuant to G. L. c. 278, § 33E. As to the remaining indictments, we reverse the convictions of assault and battery by means of a dangerous weapon and armed assault in a dwelling, and vacate as duplicative the conviction of armed burglary.

*So ordered.*

solidly identified as the central figure in the joint venture and as the actual stabber of Botelho.