## Commonwealth *vs.* Jason J. Almeida.

Bristol. September 5, 2008. - November 21, 2008.

Present: Marshall, C.J., Greaney, Spina, Cowin, & Botsford, JJ.

*Homicide. Practice, Criminal,* Confrontation of witnesses, Fair trial, Witness, Agreement between prosecutor and witness, Assistance of counsel, Disclosure of evidence.

There was no merit to a criminal defendant's claim that he was denied the right to confront and examine a spectator to his trial, who, at defense counsel's request, was barred from the court house until the end of the trial after the judge observed her apparently coaching a witness, where the spectator was present in court and available for the defendant to call as a witness, defense counsel asked the judge for no relief that he did not receive, and the defendant made no showing that an examination of the spectator might reasonably have elicited anything that would have been helpful to his case. [606-607]

At a murder trial, the defendant was not denied meaningful cross-examination of a key identification witness, where, viewing the witness's testimony as a whole, the witness's responses (including numerous instances where she could not remember or did not recall) were not the equivalent of a refusal to answer questions, nor did she claim a privilege against self-incrimination; rather, the defendant's counsel cross-examined her vigorously and at great length, impeaching her by introducing evidence of her Federal charges and plea agreement, of her threats against the defendant, and of her prior inconsistent statements, and, in his closing argument, used her memory lapses to impeach her credibility further. [607-608]

There was no merit to a criminal defendant's claim that impermissible vouching occurred for the credibility of two witnesses who had entered into plea agreements in exchange for their testimony, where the judge properly instructed the jury, both at the time of the witnesses' testimony and in his final instructions, and where the cross-examination of each witness assured that the jury were well aware of the witnesses' conflicting prior statements. [608-609]

At a murder trial, the Commonwealth's delayed disclosure of blood spatter diagrams contained in the notes of its expert witness did not deny the defendant a fair trial, where nothing in the diagrams added to the Commonwealth's case or deprived the defendant of an opportunity to rebut that case, and the defendant did not indicate how earlier disclosure of the diagrams would have enabled him to make more effective use of them. [609-611]

At the trial of indictments charging the defendant with, inter alia, murder in the first degree, no substantial likelihood of a miscarriage of justice arose

from defense counsel's actions and alleged omissions regarding a spectator that apparently was coaching a witness [611-612]; from his failure to move to strike the testimony of a key identification witness [612-613]; from his failure to seek to obtain a blood spatter expert [613]; or from his failure to file a motion to reduce the verdict [613-615].

There was no merit to a criminal defendant's pro se arguments that trial counsel was ineffective for failing to obtain a copy of a key identification witness's Federal plea agreement [615], or for not calling a witness whose testimony, at most, might impeach the credibility of that identification witness [615-616]; further, there was no merit to the defendant's contention that the Commonwealth forced two witnesses to testify falsely by threatening them with perjury charges [616].

This court declined to exercise its power under G. L. c. 278, § 33E, to reduce a verdict of murder in the first degree or order a new· trial, where the fact that the Commonwealth's evidence included testimony offered by witnesses with plea agreements was known by the jury, as was the fact that the statements those witnesses gave were not consistent. [616]

INDICTMENTS found and returned in the Superior Court Department on December 27, 2000.

The cases were tried before *Gary A. Nickerson*, J., and a motion for a new trial, filed on November 21, 2003, was heard by him.

*Greg T. Schubert* for the defendant.

*Shoshana E. Stern*, Assistant District Attorney, for the Commonwealth.

COWIN, J. A Superior Court jury convicted the defendant, Jason J. Almeida, of murder in the first degree for the shooting of Joseph Canto in the rear parking lot of a lounge in New Bedford on October 4, 2000.[1] The defendant appeals from his conviction and from the denial of his motion for a new trial. Represented by new counsel on appeal, he claims he was denied the right to confront and examine a spectator whom the judge believed was attempting to coach a witness; he was denied his right of cross-examination because of the lack of memory of a

---

[1]The conviction of murder in the first degree was on the theory of deliberate premeditation. The defendant also was convicted of unlawful possession of a firearm. No argument is made regarding this conviction, and we do not consider it. A codefendant, Russell Andrews, was convicted of unlawful possession of a firearm and assault by means of a dangerous weapon. The Appeals Court affirmed those convictions, see *Commonwealth* v. *Andrews*, 63 Mass. App. Ct. 1119 (2005), and they are not before us. Andrews was not charged with the murder.

key identification witness; the prosecutor impermissibly vouched for the credibility of two witnesses who had been charged with perjury in connection with this case; and he was denied a fair trial by reason of the Commonwealth's late disclosure of a police chemist's diagrams of blood spatter at the crime scene. The defendant asserts additionally that a new trial should have been granted because he was denied the effective assistance of counsel in the following respects: counsel took no steps to remedy the effect of a spectator coaching a witness; counsel did not move to strike the testimony of a witness with a poor memory; counsel failed to obtain a blood spatter expert; counsel did not procure the testimony of an available witness to challenge the testimony of a key identification witness; and counsel failed to file a motion for a reduction of the verdict pursuant to Mass. R. Crim. P. 25 (b) (2), 378 Mass. 896 (1979). Finally, the defendant requests that we exercise our extraordinary power pursuant to G. L. c. 278, § 33E, to order a new trial or direct the entry of a verdict of a lesser degree of guilt. We affirm the convictions and the order denying the defendant's motion for a new trial, and decline to exercise our power under G. L. c. 278, § 33E.[2]

*Facts and background.* We recite the facts the jury could have found, reserving further details for discussion of the specific issues raised. Responding police officers found the victim's body lying between a car and a truck in the rear parking lot of a lounge in New Bedford at 1:45 A.M. on October 14, 2000. The cause of death was a single bullet to the skull from a weapon that had been pressed tightly against the victim's left earlobe when the shot was fired. Two bullets were retrieved from the back of a nearby parked vehicle and a third was recovered from the wall of a building across the street.

No physical evidence connected the defendant to the shooting, but three eyewitnesses testified to relevant events. The testimony of each of these witnesses, however, was not consistent with that of the others or with their prior testimony. Moreover, two of the eyewitnesses, David Grace and John Todman, testified while

---

[2]The defendant's appellate counsel has submitted other "pro se arguments" at the defendant's request. We assume this is intended as a so-called *Moffett* brief, see *Commonwealth* v. *Moffett*, 383 Mass. 201, 207-209 (1981), and discuss these in part 6, *infra*.

under indictment for perjury. Each had an agreement with the Commonwealth that the perjury charge would be dismissed in return for truthful testimony. The third witness, Olivia Pires Lara, was awaiting sentencing on drug charges in Federal District Court and had a cooperation agreement with Federal authorities relating to the Federal charges (although not to the present case). Each of these witnesses was "scared," but the cause of their fear was not identified. Because most of the defendant's appellate issues arise from the testimony of these witnesses, we summarize their testimony in some detail.

David Grace was twenty-one years old at the time of the shooting and had known both the defendant and Russell Andrews (the codefendant) for several years. He saw the two of them in the lounge during the evening of October 13, 2000. When last call was announced (now the morning of October 14), he "saw everybody leaving from [a] pool table," the defendant and Andrews among them. Grace left the lounge as well. In the rear parking lot, he approached a group of men which included Andrews and the defendant. When Grace was about twenty feet from the group, he "saw a kid walking down the street . . . heading towards where they was at." Grace heard gunshots and saw the "kid" run past him. Grace ran in back of the "kid," seeing gun flashes behind him and to the side. He also saw the defendant with a gun in his hand, shooting. Grace heard a total of six or seven shots and finally saw the "kid" fall between a truck and a car.

John Todman was twenty-one years old at the time of trial[3] and had known Andrews most of his life. He had known the defendant "from when [he] was younger."[4] Todman came to the lounge on October 13, with Andrews and two other friends in a Ford Taurus automobile driven by Andrews. They parked on a side street near the lounge, and the four of them walked into the lounge together. Todman saw the defendant at the lounge. After last call was announced, Todman left through the back

---

[3]Testimony educates us as to the age of some of the witnesses at the time of the incident and as to others only at the time of trial.

[4]The defendant had been incarcerated for several years prior to trial, and this type of euphemism was used to avoid reference before the jury to the fact of his incarceration.

door, following Andrews and two other friends. While he was in the parking lot in a group of eight to twelve young people with the defendant standing about twenty-five or thirty feet from him, Todman saw "some guy [the victim] . . . walk out . . . from the corner" of the street toward the defendant. When the victim was about ten feet from the defendant, the defendant backed away. The victim walked "closer and closer." No one else was standing near either of them, and Todman heard no words exchanged, but he saw the defendant reach for his waist and pull out a gun. He saw a gun "in the air" with "fire" "coming . . . up in the air" from the defendant's hand, and Todman ducked behind a car. He heard a total of five or six shots.

Olivia Pires Lara was twenty-six at the time of trial, was David Grace's cousin, and knew both Andrews and the defendant. She also knew the victim, who "used to hang with [her] brother sometimes." She too was at the lounge on the night of October 13. At some point that night, she looked out the rear door and saw the defendant, Andrews, and "quite a few" others arriving in a "big car" (a Cadillac).[5] The men all entered the lounge, and at a later time, she spoke to Andrews there. As she observed an argument between the defendant, Andrews, and the victim on the dance floor, a "bouncer" told them, "Take that outside." The victim left through the rear door, with the rest of the group following him.[6] Lara looked out the door and saw the group gathered around the victim, arguing with him. Shortly thereafter, Lara went to the front door and then heard a shot. She ran down the street to the back of the lounge. There she saw the victim, the defendant, Andrews, and others standing "[b]etween cars." The victim and the defendant were standing within one foot of each other, arguing. Andrews was also standing at the victim's side. She heard yelling and swearing and saw the defendant run to the Cadillac, take something from it, and return. When Andrews pointed a gun at the victim's head, the defendant said, "Give me that," grabbed the gun from Andrews's hand, and

---

[5]This contradicts the testimony of Todman who stated that he came to the lounge with Andrews in a Ford Taurus. See *supra*.

[6]The bouncer testified that he did not recall this fight and that he was "positive" that he never told the participants to "take it outside."

shot the victim in the head behind the right ear. The gun was not visible in the darkness, but Lara heard the shot and saw the victim fall to the ground.

*Discussion.* 1. *Denial of right to confront and examine a spectator.* The defendant maintains that he was denied the right to confront and examine Kiesha Tayree-Lee Acevedo, a spectator. During the cross-examination of Todman, the judge abruptly excused the jury. He called Acevedo forward and told her that, when he returned from lunch, he saw her "in the hallway berating" defense counsel, and that "[j]ust now, I saw you signaling to the witness." The judge ordered her taken into the custody of the sheriff for the remainder of Todman's testimony and stated the following:

> "Let the record reflect that the young lady that was just placed in the custody of the court officers was observed by the Court, after [defense counsel] asked the witness questions, to be nodding in the affirmance as to questions that were to be answered with a yes, shaking her head no as to questions that were to be answered by a no prior to the witness answering.

> "The young lady in question has purposefully lined herself up to be directly in the head-on view of the witness.

> "During the course of the testimony of this witness, while [the prosecutor] was examining the witness on direct examination, the woman relocated herself twice in the courtroom so that she would have a clear view of the witness because, during much of [the prosecutor]'s examination, he was stationary near the back rail of the bar, thereby barring her view of the witness."

At the close of the day's testimony, after the jury were excused, the judge had Acevedo brought before him once more. She denied that she had been coaching Todman. At defense counsel's request, the judge barred Acevedo from the court house until the end of the trial.

It is difficult to understand the defendant's complaint that he was deprived of the right to confront or examine Acevedo. She was present in court and available for the defendant to call as a

witness. Defense counsel asked the judge for no relief that he did not receive. Indeed, as the judge noted in denying the defendant's motion for a new trial, by barring Acevedo from the court house, the judge "acted . . . in accordance with defense counsel's requests."[7] Furthermore, the defendant has made no showing that an examination of the spectator might reasonably have elicited anything that would have been helpful to his case.

2. *Reluctant witness.* The defendant maintains that he was denied meaningful cross-examination of Lara, a key identification witness, because of her "refusal" to answer questions. She did, in fact, respond, "I don't remember" or "I don't recall" numerous times, in answer to inquiries from both the Commonwealth and defense counsel. As the judge found, however, "[t]he second day of Lara's cross-examination was distinctly different both as to the tenor of the questions asked and the quality of her responses. Her testimony must be viewed in its entirety and Lara did not refuse to be cross examined." His findings are supported by the record. For example, although the defendant lists 125 occasions on which Lara responded with "I don't remember" or its equivalent on her second day of testimony, she was asked almost 1,000 questions on cross-examination that day. It was entirely reasonable for the witness to have no memory of some of the information sought by many of the questions. For example, seven questions in a row concerned the victim's clothing on the night of the murder, specifics that in the circumstances an observer could well have ignored. Her testimony did not sink to the levels that have been held to deny the right of cross-examination. Thus, her responses were not the equivalent of a refusal to answer questions, as was the situation in *Commonwealth* v. *Johnson*, 365 Mass. 534, 543-544 (1974). Nor did she claim the privilege against self-incrimination, as the witness did in *Commonwealth* v. *Funches*, 379 Mass. 283, 292 (1979). Our examination of the transcript reveals that defense counsel exercised the defendant's right to cross-examine, and as the judge stated, he "did so vigorously and at great length"; the cross-examination was not frustrated by anything that amounted to a refusal to testify.

---

[7] The defendant argues that his trial counsel was ineffective for not taking certain action in response to Acevedo's coaching. We address that contention in part 5.a, *infra*, concerning the claim of ineffective assistance of counsel.

In addition, because Lara had identified the defendant as the killer, the defendant's strategy on cross-examination was of necessity designed to impeach her credibility. He did so by introducing evidence of her Federal charges and plea agreement, of her threat against the defendant, and of her prior inconsistent statements. Her memory lapses were additional fodder for impeaching her credibility, and defense counsel so used them in his closing argument. It follows that not only was the defendant's opportunity to cross-examine not adversely affected, but there is no basis for concluding that the defendant could have accomplished anything that was more effective in impeaching the witness.

3. *Prosecutorial vouching.* The defendant claims that "impermissible vouching" occurred because Grace and Todman each testified that they were facing perjury charges at the time of trial and that they understood that the charges would be dropped in return for truthful testimony. The perjury charge in each instance arose from the fact that the witness had testified at a probable cause proceeding inconsistently with an earlier statement provided to the police. The defendant's claim of improper vouching is without merit.

It is considered improper vouching for a prosecutor to suggest that the government has special knowledge by which it can verify a witness's testimony. See *Commonwealth* v. *Ciampa*, 406 Mass. 257, 265 (1989). However, a witness may testify to the existence of an agreement with the prosecution. See *id.* at 264. "We accept the general rule that on direct examination the prosecution may properly bring out the fact that the witness has entered into a plea agreement and that the witness generally understands his obligations under it." *Id.* Moreover, "if appropriately handled, such a plea agreement does not constitute improper prosecutorial vouching for a witness." *Id.* at 260. The defendant does not suggest that the testimony regarding the plea agreement was handled inappropriately. The judge commendably handled the situation, instructing the jury properly both at the time of the witness's testimony and in his final instructions.[8] See *id.* at 266 (although jury may hear from witness testifying

---

[8]The judge instructed the jury that when a witness is testifying under an agreement that the prosecution, in exchange for his or her truthful testimony,

pursuant to plea agreement, judge "must specifically and force-fully tell the jury to study the witness's credibility with particular care"). In addition, the cross-examination of Grace and Todman assured that the jury were well aware of their conflicting prior statements.

4. *Late disclosure of blood spatter diagrams.* During the defendant's cross-examination of one of the Commonwealth's witnesses, a State police chemist, the witness revealed that she had made diagrams at the scene indicating the distance between various blood spatters and the body and the vehicles. The diagrams were part of her notes, and there is no indication that the prosecutor was aware of them prior to the witness's cross-examination. The codefendant introduced the diagrams in evidence, and both the codefendant and the defendant cross-examined the witness about them. The witness testified that she made the notes to assist her in writing her report for the investigators and then to refresh her memory for trial.

The defendant claims that the Commonwealth's delayed disclosure of the blood spatter diagrams contained in the notes of its expert witness denied him a fair trial. Although the defendant's assertions in this regard are not entirely clear, it appears that he is arguing that the State crime technician could have tested the spatters for deoxyribonucleic acid (DNA); the material in the diagrams contradicts the testimony of the pathologist that the wound was a close contact wound; the diagrams could have impeached the testimony of Grace, Todman, and Lara regarding where the victim was shot; and the defendant could have obtained a blood spatter expert to compare the blood evidence provided by the State police chemist and the State crime technician with the testimony of the eyewitnesses.

"Absent a showing of bad faith [and no claim of bad faith is made in this case], we consider the primary issue of prejudice. In measuring prejudice, 'it is the consequences of the delay that matter, not the likely impact of the nondisclosed evidence, and

will take some action (here, drop the perjury indictment), "you should examine that witness's credibility with particular care. . . . You should also . . . consider . . . that the government does not know whether the witness is indeed telling the truth. . . . [I]t is improper that the Commonwealth in any way vouch for a witness's truthfulness. It is always, always up to the jury and the jury alone to determine truthfulness."

we ask whether the prosecution's disclosure was sufficiently timely to allow the defendant "to make effective use of the evidence in preparing and presenting his case." ' " *Commonwealth* v. *Stote*, 433 Mass. 19, 23 (2000), quoting *Commonwealth* v. *Wilson*, 381 Mass. 90, 114 (1980).

We do not have the benefit of the chemist's report, which presumably was provided to the defendant prior to trial. Thus, we are unable to determine whether and how much more material was contained in the diagrams than was contained in the report. This impedes analysis of the value of the notes as compared to the report. It is instructive, however, that when the existence of the chemist's notes was revealed, defense counsel did not object, did not request a continuance to examine the notes, and did not ask for time or funds to hire an expert. Counsel for the codefendant sought (and received) a continuance of only ten minutes to examine the diagrams.

Our review of the diagrams indicates that nothing in them added to the Commonwealth's case or deprived the defendant of an opportunity to rebut that case. The defendant has not indicated how earlier disclosure of the diagrams would have enabled him to make more effective use of them. As the judge noted in denying the codefendant's posttrial motion for DNA funds, "The presence of blood at the crime scene was known to trial counsel well in advance of the trial." Indeed, the blood spatter was visible in crime scene photographs. All the diagrams did was indicate distances between the spatters and the vehicles.

Addressing specifically each of the defendant's claims regarding the delayed disclosure of the blood spatter diagrams, we point out that it is not the existence of the diagrams that creates the possibility of DNA testing; rather, it is the existence of the spatters themselves that might make such testing relevant, and the defendant was aware of those spatters before trial.[9] Concerning the defendant's contention that the existence of blood spatter contradicted the pathologist's testimony that there was no blood spatter from the victim when he was shot, the existence of blood spatter likewise was evident from the crime scene photo-

_____

[9]In addition, the defendant's claim is that the State police technician could have conducted such testing; it is unclear how State police could have been compelled to do so.

graphs in the defendant's possession. Moreover, the pathologist did not testify that there was no blood spatter. He stated that it was "possible, but not certain" that there would have been a significant amount of blood from the entrance wound, but said that the victim's earlobe may have prevented such spatter.

The defendant maintains that earlier discovery of the spatter diagrams would have helped to impeach the testimony of the three witnesses regarding the location where the victim was shot. Again, the stains and their locations were visible in the photographs. The defendant does not educate us as to how diagrams that measured the distances between the stains and other objects would have assisted him in impeaching the witnesses. Moreover, even without the diagrams, the testimony of the witnesses, Todman, Grace and Lara, differed as to where the victim was when he was shot, and the defendant exploited the inconsistencies in cross-examination and in argument.

The defendant's final contention concerning the late disclosure of the diagrams is that he could have obtained a blood spatter expert to challenge the description of the blood evidence provided by the chemist and the crime technician, in contrast to that of the eyewitnesses. He has provided no affidavit of an expert or even an explanation of how such challenge could have been made or what it would have produced.[10]

5. *Ineffective assistance of counsel.* In his remaining claims, the defendant asserts that he was a victim of ineffective assistance of trial counsel and that he is therefore entitled to a new trial. Because the defendant has been convicted of murder in the first degree, we consider his claim of ineffectiveness of counsel to determine whether there exists a substantial likelihood of a miscarriage of justice, as required under G. L. c. 278, § 33E, which is more favorable to a defendant than the constitutional standard for determining the ineffectiveness of counsel. *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992). Thus, we consider whether there was error during the course of the trial and, if so, whether the error was "likely to have influenced the jury's conclusion." *Id.* Under this more favorable standard of review, we consider a defendant's claim even if the action by

---

[10]The defendant also contends that counsel was ineffective for failing to hire a blood spatter expert. That claim is discussed in part 5.c, *infra.*

trial counsel does not "constitute conduct falling 'measurably below' that of an 'ordinary fallible lawyer.' " *Commonwealth* v. *MacKenzie*, 413 Mass. 498, 517 (1992), quoting *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). A strategic decision by an attorney, however, constitutes error "only if it was manifestly unreasonable when made." *Commonwealth* v. *Coonan*, 428 Mass. 823, 827 (1999).

a. *Spectator coaching the witness.* This issue concerns the spectator, Acevedo, whom the judge barred from the court room because he believed that she was coaching the witness Todman. The defendant claims that his trial counsel was ineffective because he did not move for a mistrial; did not move to strike Todman's testimony; did not put on the record the questions that were affected; and did not request a voir dire of Todman or Acevedo. Our review of the record indicates that trial counsel did not fail in his obligations and that the alleged omissions by counsel were not likely to have affected the conclusion of the jury. Most of Todman's testimony, certainly the most important parts, was set forth in answers that were too complex and substantive to be subject to coaching by the type of "yes or no" signals the judge suspected Acevedo of trying to send. Moreover, trial counsel vigorously cross-examined Todman and made abundantly clear both the inconsistencies in his testimony and the fact that he was testifying pursuant to a plea agreement and might be motivated to model his testimony to suit the Commonwealth's theory of the case. The defendant's rights were fully protected in regard to Todman's testimony. In addition, even had defense counsel moved to strike Todman's testimony, the judge noted, in denying the motion for a new trial, that he "would have denied [a] motion[] to strike Todman['s] . . . testimony." Such action by the judge would have been proper, and thus the defendant was deprived of nothing to which he was entitled.

b. *Testimony of Lara.* The defendant alleges that his trial counsel was ineffective for failing to move to strike the testimony of Lara, the witness who responded many times with "I don't remember" on cross-examination. As discussed above, Lara's memory problems assisted the defendant in his attempt to discredit her testimony. In denying the motion for a new trial, the judge stated that he "would have denied [a] motion[] to

strike . . . Lara's testimony inasmuch as trial counsel cross-examined [her] deliberately and extensively." Such a ruling would not have been erroneous. We conclude that the outcome of the case could not have been affected by trial counsel's failure to move to strike Lara's testimony.

c. *Blood spatter expert.* Trial counsel is faulted for not seeking to obtain a blood spatter expert. However, the defendant offers only a single proposition, i.e., that an expert could have "challenged the description of blood evidence provided by" the Commonwealth's chemist and its crime technician. The defendant has provided no expert affidavit to indicate the likely benefit of such testimony or to show that any alleged discrepancy between the notes and the live testimony was meaningful. In addition, at oral argument, appellate counsel conceded that any testimony from an expert would probably have been only cumulative. Accordingly, any alleged failure of trial counsel would not have had a likely influence on the outcome.

d. *Motion for reduction in verdict.* The defendant contends that trial counsel was ineffective for failing to file a motion to reduce the verdict pursuant to Mass. R. Crim. P. 25 (b) (2). This rule authorizes a trial judge to reduce a verdict despite the presence of sufficient evidence to support the jury verdict. See *Commonwealth* v. *Woodward,* 427 Mass. 659, 666-667 (1998), and cases cited. "That power is comparable to the power vested in this court pursuant to G. L. c. 278, § 33E, and a trial judge's decision on a rule 25 (b) (2) motion 'should be guided by the same considerations.' " *Commonwealth* v. *Rolon,* 438 Mass. 808, 820 (2003), quoting *Commonwealth* v. *Gaulden,* 383 Mass. 543, 555 (1981). Trial judges may reduce a verdict in order "to ensure that the result in every criminal case is consonant with justice." *Commonwealth* v. *Woodward, supra* at 666. "[A] judge should use this power sparingly," *id.* at 667, and not sit as a "second jury." *Commonwealth* v. *Keough,* 385 Mass. 314, 321 (1982). We only disturb a judge's order in this regard for abuse of discretion or other error of law. *Commonwealth* v. *Millyan,* 399 Mass. 171, 188 (1987).

It is appropriate for a judge to exercise discretion to reduce a verdict where the weight of the evidence, although "technically sufficient to support the verdict, points to a lesser crime." *Com-*

*monwealth* v. *Rolon, supra* at 821. For example, if the evidence of premeditation was "slim," a judge may reduce a verdict of murder in the first degree to murder in the second degree. See *Commonwealth* v. *Ghee*, 414 Mass. 313, 322 (1993). See also *Commonwealth* v. *Millyan, supra* at 188-189 (reduction of verdict appropriate where evidence of intoxication undermined theory of deliberate premeditation). If the weight of the evidence indicates that the defendant did not act with malice, a murder verdict is appropriately reduced to manslaughter. See *Commonwealth* v. *Woodward, supra* at 669-671 & n.14; *Commonwealth* v. *Gaulden, supra* at 557-558.[11] We have also viewed weakness in the evidence supporting the verdict together with trial error as supporting a reduction of the verdict. See *Commonwealth* v. *Woodward, supra* at 671 (jury not instructed on manslaughter when evidence suggested defendant did not act with malice). Reduction to a lesser verdict is not justified, however, when the reduction "would be inconsistent with the weight of the evidence, or . . . based solely on factors irrelevant to the level of offense proved." *Commonwealth* v. *Rolon, supra* at 822.

Thus, we must consider whether there was weakness in the evidence that the defendant committed deliberately premeditated murder or evidence indicating that he "more likely" committed a lesser form of homicide. *Id.* In denying the motion for a new trial, the judge wrote: "The notion that the evidence warranted something less than a first degree verdict is nonsense if one credits the eyewitnesses. [The victim's] death was nothing short of an execution." Our review of the record indicates that there was "no weakness in the evidence" of deliberately premeditated murder and that the weight of the evidence does not indicate a lesser homicide offense. *Id.* at 825. Thus, failure to file a motion to reduce the verdict was not an omission that would have altered the conclusion in this case.

With reference to the entire range of accusations of ineffective assistance, we have examined and rejected the specific

[11]In exercising our authority pursuant to G. L. c. 278, § 33E, we have similarly reduced convictions of murder in the first degree to murder in the second degree for weakness in the evidence of deliberate premeditation. We have also reduced murder verdicts to manslaughter where the weight of the evidence suggested that a defendant did not act with malice. See *Commonwealth* v. *Rolon*, 438 Mass. 808, 821 nn.15 & 16 (2003), and cases cited.

challenges to trial counsel's performance. We add that our over-all review of the record indicates that trial counsel was vigilant, aggressive, and assertive, acting to preserve all possible rights of the defendant.

6. *Defendant's pro se arguments.* We consider other "pro se arguments" submitted by the defendant's appellate counsel at the defendant's request.

a. *Federal plea agreement.* The defendant claims trial counsel was ineffective for not obtaining a copy of Lara's Federal plea agreement because this "would be evidence of inducement or reward for testimony." The jury were aware that both Grace and Todman were testifying pursuant to agreements that their perjury charges would be dismissed in return for their truthful testimony. The jury credited their testimony nonetheless. The jury were also aware that Lara was testifying while awaiting sentencing in a Federal drug prosecution to which she had pleaded guilty. She was cross-examined extensively about this agreement, and the abundant inconsistencies in her testimony on all subjects were aired thoroughly. It is unlikely, therefore, that additional details regarding that agreement would have affected the outcome.

In addition, there is no showing that the Federal plea agreement had any relation to the present case. When this issue arose, the prosecutor stated at sidebar that he had not participated in the Federal negotiations and that he had obtained the names of the assistant United States attorney and Lara's Federal counsel from the defense. In an attempt to comply with the defendant's discovery request, the prosecutor had received assurances from both attorneys in that matter that the Federal agreement "did not touch upon . . . this case that we're trying today, this matter, at all." There is no suggestion that in managing a routine Federal drug case the Federal authorities had any concern with respect to a State homicide prosecution.

b. *Failure to call a witness.* The defendant maintains that trial counsel was ineffective for not calling a witness who, the defendant claims, was outside the lounge with Lara just before the shooting. He states that this person "pulled Lara to the ground immediately making it impossible for her to see the shooting." There is no affidavit from this potential witness relating his observations or actions. At most, his testimony might impeach

Lara's credibility. Impeachment evidence is not ordinarily the basis of a new trial, see *Commonwealth* v. *Sleeper*, 435 Mass. 581, 607 (2002), and Lara's testimony was subjected to considerable impeachment in any event.

c. *Perjury.* The defendant argues that the Commonwealth forced Todman and Grace to testify falsely by threatening them with perjury charges that could not be proved. The defendant claims that perjury could not be proved because the "witness had not given prior testimony under oath or/and in any other court proceeding which is requirement [*sic*] and element for perjury." He is factually incorrect. The witnesses had testified under oath at a probable cause hearing.

The defendant also claims that the statements that these two witnesses gave to the police could not be admitted because the witnesses did not adopt those statements at the probable cause hearing. The statements were prior consistent statements made before a motive to fabricate existed, and were properly admitted for the limited purpose of rebutting a claim of recent fabrication. See *Commonwealth* v. *Wright,* 444 Mass. 576, 582-583 (2005). The judge provided correct limiting instructions. Additional arguments against admission of the testimony are unavailing.[12]

7. *Relief under G. L. c. 278, § 33E.* The jury apparently believed the Commonwealth's evidence. The fact that this evidence included testimony offered by witnesses with plea agreements was known to the jury, and the fact that the statements they gave were not consistent was also known to the jury. See *Commonwealth* v. *Cruz*, 442 Mass. 299, 312 (2004). These factors do not convince us, after our review of the entire record, that we should exercise our extraordinary powers to reduce the verdict or order a new trial.

> *Judgments affirmed.*
>
> *Order denying motion for*
> *a new trial affirmed.*

---

[12]The defendant also seeks relief under G. L. c. 278, § 33E, on the basis that the verdict was against the weight of the physical evidence. We address this contention in part 7, *infra.*