NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11503


COMMONWEALTH  vs.  IDELFONSO VELEZ.



Middlesex.     October 6, 2017. - May 11, 2018.

Present:  Gants, C.J., Gaziano, Cypher, & Kafker, JJ.


Homicide.  Practice, Criminal, Assistance of counsel, New trial,
     Capital case.  Insanity.  Mental Impairment.




Indictments found and returned in the Superior Court
Department on September 30, 2010.

The cases were tried before Sandra L. Hamlin, J., and a
motion for a new trial, filed on August 6, 2014, was heard by
Kimberly S. Budd, J.



Theodore F. Riordan (Deborah Bates Riordan also present)
for the defendant.
Jessica Langsam, Assistant District Attorney (Joseph T.
Gentile, Assistant District Attorney, also present) for the
Commonwealth.


CYPHER, J.  A jury convicted the defendant, Idelfonso

Velez, of two counts of murder in the first degree for the

deaths of Angel Ortiz and Trisha Bennett.  Each conviction was

based on theories of premeditation and extreme atrocity or

cruelty.  Represented by new counsel on appeal, the defendant moved for a new trial, arguing that his trial counsel was ineffective for pursuing an impracticable third-party culprit defense, rather than lack of criminal responsibility or mental impairment defenses based on the defendant's record of mental health problems and substance use.  The defendant appeals from his convictions and from the denial of his motion for a new trial.  We vacate the denial of his motion for a new trial and remand the case to the Superior Court for an evidentiary hearing.

1.  Background.  a.  Facts.  In April, 2010, Ortiz and Bennett, who were boy friend and girl friend, were living in a two-bedroom apartment with Bennett's two year old daughter.  Ortiz and the defendant were friends, and the defendant had previously stayed overnight at the apartment.

On the evening of April 30, 2010, the defendant was again staying overnight at the apartment.  At 3:31 A.M. on May 1, 2010, the defendant telephoned 911 from Bennett's cellular telephone and reported a home invasion.  The defendant told the dispatcher that masked men had entered the apartment he was in and had stabbed him and his friends.[1]

---

[1] Between 2:10 and 2:35 A.M., one of the tenants in the apartment below Ortiz and Bennett's was bothered by the sound of Ortiz and Bennett's washing machine.  Between 2:30 and 2:40 A.M., that tenant heard a woman's loud scream.  The screaming

At 3:40 A.M., police officers arrived at Ortiz and Bennett's apartment building. The entryway to the building was locked and could only be opened by someone with a key or by a resident responding to the doorbell by remotely unlocking, i.e., "buzzing" open, the door. Officers pressed many buzzers until a tenant responded and allowed the door to be opened. Upon locating Ortiz and Bennett's apartment, officers found the door ajar but saw no sign of damage to the door, lock, or handle. In the apartment, police found a knife and towels in the kitchen sink, both with blood on them. There was blood in the bathroom. A vase on the floor and a mirror and a photograph hanging on the wall in the hallway appeared undisturbed.

Ortiz and Bennett's bodies were found in the main bedroom. Ortiz's body was at the foot of the bed with a comforter tightly wrapped around his head. He had blunt-force injuries to his head and an arm and sharp-force injuries to his neck and torso and an arm.[2] He died from an approximately four and one-half

_____

continued intermittently for ten to twenty minutes; a woman's voice once screamed the word "stop." At the same time, the tenant heard footsteps coming from Ortiz and Bennett's apartment. The footsteps continued after the screaming stopped. By 3:13 A.M. the screaming had stopped and the tenant heard "words as if a child were having a temper tantrum on the floor." The tenant did not telephone the police.

[2] According to the medical examiner's testimony, a sharp-force injury is something that has a sharp edge and penetrates the body. Sharp-force injuries are categorized as stab wounds or incisions. A stab wound is a wound that is deeper into the

inch deep stab wound to his neck.  Bennett's body was on the other side of the room, between the bed and a wall.  She had twenty-four sharp-force injuries and died from two stab wounds to her neck, either of which alone would have been fatal.  She also had blunt-force injuries to her body.  The medical examiner testified that Ortiz and Bennett had each experienced pain before dying.

In the main bedroom, police found three bloody footprints on the bed.  Two were matched to the defendant's footprint, but one footprint was never identified.  In the other bedroom, where Bennett's daughter usually stayed and where the defendant was to sleep that night, there was a computer displaying a pornographic Web site.  The computer had been used to view pornography between 2:42 and 2:51 A.M.

Officers found the defendant lying on the ground outside the building in a fetal position.  He did not respond to officers' attempts to communicate, although he seemed conscious and alert.  The defendant was wounded on his knee, abdomen, forearm, and fingers.  Emergency medical technicians (EMTs) arrived and tended to his injuries, eventually moving him to the back of a parked ambulance.  While the defendant was being

---

body than it is long on the skin's surface.  An incision is the opposite:  a wound that is longer on the skin's surface than it is deep into the body.  A blunt-force injury occurs when the body is struck by an object with a blunted surface, usually causing bruises or fractures.

treated, he began to get upset and call out someone's name, possibly calling out for Ortiz.[3]  The defendant became more physically agitated until a police officer got into the ambulance and restrained one of the defendant's legs.  After the defendant calmed down, he was transported to a hospital.

b.  The defendant's statements to police.  The same police officer who had restrained the defendant's leg rode in the ambulance with the defendant and found him to be calm.  The officer asked the defendant what happened.  The defendant reported drinking beer and using cocaine throughout the evening.  According to the defendant, he went to sleep in Bennett's daughter's bedroom and was awoken by sounds of a struggle in Ortiz and Bennett's bedroom.  In that room, he saw Ortiz gasping for air while a man stood over him with a knife.  The defendant described the man's clothing but could not give any other information about him.  After the officer repeated the defendant's statement to him, the defendant said that there were two men in the room, although only one was holding a knife, and that the men must have been waiting for the defendant.  The officer asked the defendant to describe the knife; in response the defendant put up his hands approximately ten to twelve

---

[3] One officer at the scene testified that the defendant was calling out the name "Pluto" or "Flito," but stated that he was not sure what the defendant was saying because the officer could not understand the defendant.  Ortiz was known by the nickname "Filto" to his friends.

inches apart, which the officer understood to mean was the length of the knife. The defendant explained that he struggled with both of the men, that the man with the knife stabbed him in the stomach, and that the defendant continued to fight for the knife.

They arrived at the hospital, and the defendant was treated for his wounds. A urine toxicology test was presumptively positive for cocaine metabolite and showed that the defendant had a serum alcohol level of ninety-six milligrams per deciliter, roughly equivalent to a blood alcohol level of 0.096, when the sample was taken at 4:32 A.M.

That same day, in the hospital, more police officers spoke with the defendant. The defendant asked if Bennett and Ortiz were alive. The defendant told police that he had been lying down in the "kid's room" when he heard Bennett sounding distressed and saying, "Baby, baby, baby." He went to Ortiz and Bennett's bedroom and saw both of them bleeding on the floor. He was attacked by someone with a knife and tried to defend himself. He saw another person run out of the apartment. Both of these people had their faces covered.

At approximately 11:30 A.M., after he was discharged from the hospital, the defendant accompanied officers to the police station. The defendant told officers that after being dropped off, Bennett used the buzzer system to allow the defendant

access to the building and then allowed him into the apartment. The defendant believed both Bennett and Ortiz went to sleep. The defendant smoked a cigarette and drank a beer. At approximately 2 A.M., the defendant went into the "kid's room," removed his sneakers, and watched pornography for about ten minutes. Then he heard footsteps in the hallway and heard Bennett yell, "Baby, baby, baby." He put on his sneakers and looked into Bennett and Ortiz's room. The defendant saw Ortiz lying in a pool of blood and someone standing over Bennett. The person standing over Bennet had a shirt pulled over his head, obscuring his face. The defendant made eye contact with the man standing over Bennett and heard someone in the bedroom closet. Someone ran out of the bedroom from the closet area wearing a hooded sweatshirt pulled around his face so that only his eyes were visible. That person ran toward the defendant and then out of the apartment. The person standing over Bennett then attacked the defendant with a knife. The defendant tried to defend himself as the man with the knife attacked him in the hallway. The assailant dropped the knife, ran down the hallway, and left the apartment.

The defendant picked up the knife for protection in case the intruders returned. He cleaned his wounds in the bathroom and returned to check on Bennett and Ortiz. He found Ortiz lying in a pool of blood, making gasping and gurgling sounds.

The sounds made the defendant feel sick so he put the comforter over Ortiz. The defendant went to the kitchen to further wash his wounds and placed the knife in a towel in the kitchen sink.

The defendant searched the closet in the victims' bedroom for something to create a tourniquet around a wound on his arm. He sought a cellular telephone because he believed his own telephone was not working. He searched drawers and Bennett's purse until he found her telephone. The defendant then returned to the kitchen and tried to light a cigarette, but he had too much blood on his hands so the lighter became clogged. The defendant consumed some of a beer that was on the dining room table. He telephoned 911, left the apartment, and lost consciousness outside. At this point in the conversation, the police took a break from interviewing the defendant.

After returning from the break, the defendant reiterated his earlier statements with some alterations. The defendant was "really, really scared" and wanted to leave the police station to go to Pennsylvania. At the conclusion of the interview, the defendant left the police station. He was indicted approximately five months later on September 30, 2010.

The defendant moved to suppress the statements he made to the police on the day of the homicides, arguing that the statements were involuntary and therefore inadmissible because the defendant had preexisting mental health conditions, had

ingested cocaine and alcohol that exacerbated those conditions, had received narcotics for pain in the emergency room, and was deprived of sleep.

In support of his argument at the hearing on the motion, the defendant introduced the testimony of a clinical and forensic psychologist who had examined the defendant's records and concluded that the defendant could not have knowingly waived his rights or made voluntary statements to the police.  The defendant also introduced records of his mental health treatment and diagnoses.

The Commonwealth introduced the testimony of an EMT who treated the defendant and transported him to the hospital, five police officers who interviewed or interacted with the defendant, and an emergency department physician who treated the defendant.  All testified that the defendant appeared coherent on the day of the homicides and when speaking with police.

The motion judge denied the defendant's motion to suppress, crediting the defense expert's opinion that the defendant was "suffering from a serious mental illness and was not taking his medication at the time of this incident," but concluding that he was able to knowingly waive his Miranda rights.[4]

c.  Third-party culprit defense.  At trial, in his opening statement and in his closing argument, defense counsel argued

_____

[4] The defendant does not challenge this ruling on appeal.

that a third-party culprit, Jonathan Gonzales, was responsible for the homicides. Gonzales is the father of Bennett's daughter and was Ortiz's friend until the two became estranged. Defense counsel explained in his opening statement that Gonzales had the following motives: (1) Bennett stopped dating Gonzales to date Ortiz; (2) Ortiz stole $10,000 from Gonzales; and (3) Ortiz was violent toward Bennett. In 2009, when Gonzales was incarcerated, he told his and Bennett's mutual friend, Shannon Begg, that he wanted to hire someone to kill Ortiz. After the homicides, Gonzales told Begg, "Fuck you all. I did it. And fuck you all."

The Commonwealth disputed this defense through direct examination of Gonzales. He denied killing Ortiz and Bennett or hiring others to do so. He testified that he made the inculpatory statement to Begg because he was very frustrated after the homicides that people suspected his involvement. Gonzales also accounted for his whereabouts throughout the evening of the homicides. The Commonwealth corroborated this with testimony from four witnesses, security camera video footage, and telephone records. Defense counsel questioned Gonzales about his involvement on cross-examination, but introduced no defense witnesses to support a theory that Gonzales was the third-party culprit.

2. <u>Discussion</u>. The defendant appeals from his convictions and from the denial of his motion for a new trial, arguing in both that trial counsel was ineffective for advancing a third-party culprit defense instead of pursuing defenses based on the defendant's mental health or intoxication. He also urges us to exercise our power, pursuant to G. L. c. 278, § 33E, to set aside the verdicts or reduce the degree of guilt.

When a defendant alleges that his attorney committed a strategic error, as the defendant does on appeal and in his motion for a new trial, we consider whether trial counsel's tactical choice was manifestly unreasonable at the time the choice was made. <u>Commonwealth</u> v. <u>Almeida</u>, 452 Mass. 601, 611-612 (2008). Where trial counsel's tactic was manifestly unreasonable, his representation is ineffective if it created a substantial likelihood of a miscarriage of justice. <u>Commonwealth</u> v. <u>Wright</u>, 411 Mass. 678, 682 (1992), <u>S</u>.<u>C</u>., 469 Mass. 447 (2014).

A strategy is manifestly unreasonable if "lawyers of ordinary training and skill in the criminal law would [not] consider [it] competent" (quotation and citation omitted). <u>Commonwealth</u> v. <u>Kolenovic</u>, 471 Mass. 664, 674 (2015), <u>S</u>.<u>C</u>., 478 Mass. 189 (2017). The defendant argues that it was manifestly unreasonable to pursue a third-party culprit defense and forsake any argument that the defendant was not criminally responsible

or could not form the requisite mental state as a result of a mental impairment. The defendant contends that his lengthy history of mental illness and consumption of alcohol and cocaine prior to the homicides support such defenses.[5]

The Commonwealth alleges that counsel chose to pursue a third-party culprit defense after losing the motion to suppress because, presumably, counsel wanted to avoid tainting the defendant's credibility by pursuing a defense that was inconsistent with the defendant's statements.[6] However, on two occasions before the motion to suppress was denied, counsel told the judge that he would not be pursuing lack of criminal

---

[5] Had trial counsel presented a defense based on the defendant's mental health and substance use, such a defense could have been one of a lack of criminal responsibility, see Commonwealth v. McHoul, 352 Mass. 544, 548-555 (1967), or of mental impairment, see Commonwealth v. Gould, 380 Mass. 672, 680-683 (1980). A successful defense resulting in a verdict of not guilty for lack of criminal responsibility would have demonstrated that the defendant lacked "substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law" (citation omitted; brackets in original). McHoul, supra at 547. A successful defense of mental impairment, resulting in a conviction of a lesser charge, would have proved that "an abnormal mental condition negate[d] [the defendant's] capacity to form a specific intent or his ability to make a decision in a normal manner." Commonwealth v. Urrea, 443 Mass. 530, 535 (2005). The defendant would have had to prove that he lacked the mental capacity to engage in premeditation and that he was unable to appreciate that his acts were extremely atrocious or cruel and to stop committing those acts. Id.

[6] The defendant accepted this assumption during the motion for a new trial and on appeal, apparently unaware that counsel had made this choice before the motion to suppress was denied.

responsibility or mental impairment defenses.[7]  On the first occasion, two weeks after the conclusion of the hearing on the motion to suppress, counsel informed the judge that he was waiving any mental health defense.  On the second occasion, nearly two months later, and still before the motion to suppress was decided, counsel again assured the judge that he was not pursuing defenses based on the defendant's mental health or substance use.

To determine whether this was a reasonable strategic choice at the time it was made, it is necessary to understand counsel's reasoning at the time he informed the judge that he would not pursue lack of criminal responsibility or mental impairment defenses.  See Almeida, 452 Mass. at 612; Commonwealth v. Coonan, 428 Mass. 823, 827 (1999) (we assess if counsel's decisions were reasonable "when made").  In support of the motion for a new trial, the defendant submitted the psychiatric records that had been introduced at the motion to suppress and additional psychiatric records.  The defendant argued that his history of schizoaffective disorder and his substance use prior to the homicides supported defenses of lack of criminal

---

[7] The record did not include a transcript of the events in court in which defense counsel made these statements.  In our effort to discern why trial counsel chose this strategy and fulfil our responsibility under G. L. c. 278, § 33E, we ordered transcriptions of the status conference and hearing on the motion to continue and learned of defense counsel's statements.

responsibility and mental impairment. The defendant also submitted an affidavit stating that after the motion to suppress had been denied, trial counsel told him that counsel would pursue a third-party culprit defense.[8] The defendant did not submit an affidavit from trial counsel, however, and the defendant's affidavit does not explain defense counsel's reasoning at the time he waived lack of criminal responsibility and mental impairment defenses.

The defendant requested an evidentiary hearing. The motion judge denied the request, pursuant to Mass. R. Crim. P. 30 (c) (3), as appearing in 435 Mass. 1501 (2001) ("The judge may on rule on the issue or issues presented by such motion on the basis of the facts alleged in the affidavits without further hearing if no substantial issue is raised by the motion or affidavits"). To determine whether a "substantial issue" has been raised, we consider the seriousness of the deficiency asserted and the adequacy of the defendant's showing. Commonwealth v. Stewart, 383 Mass. 253, 257-258 (1981). A credible claim of ineffective assistance of counsel is serious and, when a sufficient showing is made, may merit an evidentiary hearing. See Commonwealth v. Licata, 412 Mass. 654, 660-663

_____

[8] This could not be the reason trial counsel did not pursue lack of criminal responsibility or mental impairment defenses. As we noted, defense counsel told the judge before the motion to suppress statements was denied that he would not be pursuing such defenses.

(1992).  Often, affidavits alone suffice to determine the
necessity of an evidentiary hearing.  Here, however, when we
consider the affidavits that were submitted to the motion judge,
the transcripts that were not originally included in the record
or submitted to the motion judge, and the defendant's mental
health records, we perceive inconsistencies that merit a closer
look.  Trial counsel's decision to pursue a third-party culprit
defense may have been a sound strategic choice or the choice
preferred by the defendant.  On this record, however, we cannot
be certain.

We have reviewed the defendant's mental health records, and
we cannot say that such a defense did not have potential
support.  The information in the mental health records suggests
that defenses of lack of criminal responsibility and mental
impairment were not necessarily inconsistent with the statements
the defendant made to the police.  However, this is not a case
where it is apparent on the face of the record that counsel was
ineffective in choosing to forgo a mental health or criminal
responsibility defense.  See, e.g., Commonwealth v. Williams
(No. 1), 68 Mass. App. Ct. 287, 290-291 (2007) (remanding for
further fact finding to determine if trial counsel's performance
was "manifestly unreasonable" where record was insufficient to
make such determination).  Some of the evidence in the
defendant's medical records indicates that, before the

homicides, he suffered from hallucinations, including auditory hallucinations, that people were telling him to hurt people. After the homicides, he reported seeing people coming to hurt him.  Such evidence, if developed and if admissible, might have supported such defenses.  It might also have served to explain, in part, the defendant's statements to the police that others were in the apartment.  This evidence was not brought to our attention on appeal or to the attention of the judge in the motion for a new trial.

While ordinarily we defer to the discretion of a judge on whether a motion for a new trial requires an evidentiary hearing, in these unusual circumstances, we believe that an evidentiary hearing is necessary in order to determine whether trial counsel's strategy was reasonable in light of the defendant's particular mental health history.[9]  Licata, 412 Mass. at 660-661.  Without sufficient information about trial counsel's intentions and strategic choices, the motion judge could not determine whether it was "manifestly unreasonable" for trial counsel to forgo these defenses when he chose to do so. We conclude that it is necessary to vacate the order denying the defendant's motion for a new trial and remand this case to the Superior Court for an evidentiary hearing.  See Commonwealth v.

---

[9] We express no opinion regarding the merits of the motion for a new trial.

Celester, 473 Mass. 553, 574 (2016) (vacating denial of motion for new trial and remanding for evidentiary hearing on issue of ineffective assistance of counsel where defendant's state of mind during interrogation was at issue, defendant did not testify at evidentiary hearing, and defendant's affidavit was not considered by judge).

3. Conclusion. With respect to the defendant's appeal from the order denying his motion for a new trial, we vacate that order and remand the case to the Superior Court for an evidentiary hearing and further proceedings consistent with this opinion. We do not reach the defendant's direct appeal.

So ordered.